## 39330. SANDERS v. THE STATE.

BELL, Justice.
    Lillian Sanders appeals her conviction and life sentence for the murder of her infant daughter, Cassandra Denise Sanders. There was evidence at trial showing that Cassandra was born September 11, 1981. She was twelve weeks premature and had a low birth weight, a hernia, and anemia. She was hospitalized for treatment of these ailments and was discharged November 6. On November 17 she was treated at a pediatric clinic for fussiness stemming from a suspected allergy, and on November 30 for a cold and a fungus infection. The clinic's record of the November 30 examination had a notation that Cassandra had gained weight, but did not indicate that bruises or other injuries had been found.
    At about 3:00 p.m. on December 3, 1981 appellant used a neighbor's phone to call the police. She told the police dispatcher her baby was sick, and asked for an ambulance. The dispatcher later said appellant was not sobbing, and her voice seemed normal; appellant's neighbor testified she seemed worried. After making the call Sanders returned to her own home, from which the neighbor then heard crying and hollering. When the county emergency medical service arrived at appellant's residence a few minutes later, the technicians found her holding Cassandra in her arms. One technician asked what the trouble was and she replied the baby had been crying and had just stopped. She also repeatedly told them, "Please don't let my baby die." The technicians gave Cassandra a quick examination and found multiple bruises on her face, neck, chest and abdomen. A patch of skin was missing from her neck, and one side of her head was mushy due to blood and fluid under the skin. The child was gasping for breath, had a high pulse and low respiration, and appeared unconscious. The technicians then took Cassandra and her mother to the emergency room of Archbold Hospital, arriving about 3:20 p.m. At the emergency room Dr. Randolph Malone examined the infant, who had stopped breathing and was being given artificial respiration. At that point she was unconscious and appeared dead. Because she had suffered a severe head injury and had unusual bruise marks

around the neck he had the police notified, and he questioned Lillian about what had happened. She told him she did not know, even though she had been with the baby right until she left to ca'l the ambulance.

Forest Roberts, a child protective services worker with the Thomas County Department of Family and Children Services, was summoned to the hospital and was told that Sanders was suspected of child abuse. She questioned appellant, who first told her that she did not know what had happened to the baby, that there had been nothing wrong with her earlier, and that she had gone in to check on her and found her like that. She said she might have "popped" her to make her stop crying, but insisted she had not hurt her. However, Sanders admitted after more questioning that she had not felt well that morning and had been depressed. She had been alone with Cassandra and her older child, Chrishenbo Lashan, that afternoon. The baby had begun to cry so she changed her and gave her some milk. When Roberts asked how the child had gotten its neck bruises appellant maintained she did not know, but then a few minutes later she said some milk had dried and caked around Cassandra's neck, and that she had scrubbed her neck to remove the milk, and might have bruised and scratched her in the process. Roberts left the room, then returned and told her the child was seriously ill, that it did not appear she had gotten that way by herself, and appellant needed to tell her what happened. Lillian said she may have dropped the baby but did not remember, then she said the baby cried all the time and she must have dropped it. Sanders appeared upset and nervous during this interrogation, but was not hysterically crying or otherwise showing a lot of emotion. While Roberts was questioning Sanders the police arrived. They were present during some of the questioning, and at some point read Sanders Miranda warnings. In the course of their interrogation she told them that the child had fallen out of her hands when she reached for something on a table or chest of drawers in the bedroom. She was asked if the child had struck anything except the floor, and she said she had not. Her demeanor during this inquiry was confused but otherwise normal, except that a few minutes later she cried.[1]

The baby was pronounced dead at 5:30 that afternoon. Appellant was taken to the police station where shortly after 7:30 that evening she was again questioned after being given Miranda

---

[1] The trial court conducted a Jackson-Denno hearing and found by a preponderance of the evidence that Sanders' statements given to or in the presence of the police were freely and voluntarily given.

warnings, and again she said she had dropped the baby, that it had not hit anything except the floor, and she did not know how she had been that badly injured. During this interrogation Sanders expressed concern about what would happen to her and asked if she told the truth would she still have to go to court or jail. The police told her they could not promise anything, whereupon she volunteered she had been upset, was pregnant, and did not want another baby. Sanders consented to a search of her house, during which she pointed out the spot where she claimed the baby had fallen and again denied the baby had hit anything except the floor. Sanders was allowed to go home for the night, but was questioned again at the police station shortly after 6:00 p.m. the next day. After being advised a third time about Miranda rights, she told the police she had gone downtown the previous day, leaving Cassandra in her sister's care. When she returned the child had no scratches, bruises, or other apparent injuries. After she related this story, the police then told her she was being charged with murder, and she asked them about securing bond. When queried about Cassandra's head injury, she said she may have mashed her head while picking her up.

Dr. Larry Howard, forensic pathologist and Director of the State Crime Laboratory, performed the autopsy. He testified that the primary cause of death was a severe crushing type head injury which consisted of a circular skull fracture on the right side of the head. There was severe damage to the brain, including much bleeding into the brain tissue and laceration of the brain by the edges of the skull fracture. There were numerous bruises on the face, chest and abdomen. The neck had considerable bruising and abrasions which were possible fingernail marks, indicating pressure may have been applied to the neck with a hand. Similar possible fingernail abrasions were found on the chest and the back of the right hand. The upper right arm was broken, probably by someone placing tension on it until it snapped. The liver had been split, which was an injury consistent with a blow to the front of the chest. This injury was at least four and possibly twelve hours older than many of the others, which appeared fresh. Some of the bruises were lined up as if caused by a blunt instrument with several projections, which would have been consistent with the child having been struck by the knuckles of a hand. In his opinion these injuries were not consistent with the child having been dropped on a floor, and he described them as evidencing a typical battered child syndrome. Moreover, he testified they would have been impossible for another young child to inflict.

The defense rested without introducing evidence, and the jury returned a verdict of guilty. Sanders was sentenced to life imprisonment and appealed without having moved for a new trial.

1) Although appellant has not raised the general grounds we have nevertheless reviewed the evidence in a light most favorable to the jury's verdict. See *Payne v. State,* 249 Ga. 354 (1) (291 SE2d 226) (1982). We conclude that a rational trier of fact could reasonably have found Sanders guilty of murder beyond a reasonable doubt. Jackson v. Virginia, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

2) In her first enumeration of error appellant complains that the trial court should not have admitted into evidence the state's thirteenth exhibit, which was an autopsy photograph of the victim with her scalp reflected to show the fractured skull, lacerated brain, and blood from hemorrhaging, on the ground that it was an intentional distortion of the original evidence and was gruesome and inflammatory. Although the photograph is gruesome, we find its admission was necessary to show the cause of death, which had become apparent only because of the autopsy. *Brown v. State,* 250 Ga. 862 (5) (302 SE2d 347) (1983).

3) In her second enumeration Sanders claims the state impermissibly placed her character in issue. The record shows that three employees of the Department of Family and Children Services ("the Department") testified for the prosecution. Their combined testimony established certain aspects of appellant's personal history and the fact that appellant had sought the Department's help on several occasions. Specifically, they testified that during the period 1976-81 Sanders had moved several times and had asked the Department for help in locating housing; that she had sought food stamps; that both her children had been problem pregnancies; that appellant's mother had contacted the Department and complained about the quality of care Chrishenbo was receiving and about appellant's attitude toward the child; that Lillian was counseled about child care and a stable living environment; and that appellant's mother's own family had been supervised by the Department for several years. Following this testimony about appellant's background, Dr. Wallace Kennedy, a clinical psychologist, took the stand to testify about the "battering parent syndrome."[2] After his qualifications as an expert in the field of clinical and family psychology and child abuse were established, Dr. Kennedy constructed a profile of the typical abusive parent.[3] He testified that the characteristics of an adult who abuses a child in a life threatening

---

[2] This term is not Dr. Kennedy's, but clearly represents his concept. See State v. Loebach, 310 NW2d 58 (Minn. 1981), infra, p. 75.

[3] Although Dr. Kennedy indicated he had researched this area and was familiar with the relevant literature, he cited no specific source for his profile and he attempted no showing of its scientific validity.

fashion almost always are, first, that the parent herself is the product of a violent, abusive environment and usually commits violent acts with growing frequency; second, that the parent is under some kind of chronic environmental stress, caused by, for example, money or housing problems, and is frequently a single parent; third, that the parent has a history of poor social judgment, in that she tends to be impulsive or explosive under stress; fourth, that the child she absues is the product of an unplanned, difficult, and unpleasant pregnancy and is prematurely born; fifth, that the abused child is a chronically difficult child, either sickly or frequently crying. The following exchange between the prosecutor and Dr. Kennedy then took place: Q. "Is there a difference between a child that's suffering from a lethal abuse where as (sic) just random spanking abuse, Doctor?" A. "Yes." Q. "What's the difference, please sir?" A. "The main difference in the history is that a parent who is likely to kill a child is a person who has engaged in some kind of life threatening behavior in the past. That is, pulling knives on people, threatening people with sticks or engaging in lethal behavior. That is, I personally have not had a circumstance in all the twenty-three (23) years which (sic) you have a person who has killed a child that has not had a previous history of violence unless it was a psychotic mother where the killing of a child —" MR. ANDREWS: "—Your Honor, if I may at this time I'd like to object and move for a mistrial."

This motion was denied and the state, without further objection from defense counsel, proceeded to retrace much of the same ground, eliciting substantially similar testimony about the second through fifth criteria. Sanders appeals from the denial of her motion for mistrial.

We have held that under appropriate circumstances a woman who kills her husband or boyfriend and raises the defense of self-defense may, as evidence of whether she acted in fear of her life, have an expert witness describe the "battered woman syndrome," apply that model to the facts, and conclude that the woman falls within the profile. *Smith v. State,* 247 Ga. 612 (277 SE2d 678) (1981).[4] We also observed in *Smith* that it is accepted practice for the state to offer expert opinion testimony that a child is a victim of "battered child syn-

---

[4] The other primary issue in *Smith* concerned the admissibility of expert opinion testimony on issues of ultimate fact. Not considered were whether the particular clinical psychologist whom Smith sought to use was qualified to give an opinion in that area (her qualifications were not contested by the state), and whether the state of the art of the study of battered women and the application of diagnostic profiles to particular defendants have reached a scientific stage of verifiable certainty. *Harper v. State,* 249 Ga. 519 (1) (292 SE2d 389) (1982).

drome" and that its injuries are not accidental. *Id.* at 617.[5] In addition, we cited the case of State v. Baker, 424 A2d 171 (N. H. 1980). *Smith,* supra, at 617. In Baker the defendant husband claimed his attempt to kill his wife was the result of insanity, but the state contended it was but a single episode in a recurring pattern of domestic violence. Baker called two psychiatrists who testified that in their opinion he was insane at the time of the crime, and the New Hampshire Supreme Court held that the state then could properly call an expert on domestic violence to testify regarding the battered wife syndrome and to give his opinion that mental illness is not an important cause of wife beating. It was also proper, the court ruled, for the state's expert to state his opinion that, based on prior testimony by Baker's wife and daughter that he had physically abused them, Baker's marriage probably fell within the contours of the battered woman syndrome. We have not previously been faced with a case wherein the state has seized the initiative and attempted to use a profile in its case-in-chief as an affirmative weapon against the defendant;[6] however, this question has been confronted by another appellate court. State v. Loebach, 310 NW2d 58 (Minn. 1981). In that case Loebach appealed his conviction for murdering his infant son. At trial the state had called an expert on child abuse, Dr. Robert ten Bensel, to testify that, based on the child's injuries, in his opinion the child had suffered from nonaccidental physical abuse over a period of time and accordingly was a victim of battered child syndrome. Ten Bensel also testified over objection that battering parents tend to have similar personality traits and personal histories; he described those

---

[5] As support for this principle we cited State v. Wilkerson, 247 SE2d 905 (N.C. 1978). However, the Wilkerson court took pains to indicate the limits of the use of the battered child syndrome. Although an expert may diagnose a particular child as a "battered child," explain the use of that term, and give his opinion regarding the usual cause of the syndrome, *i.e.,* that it is usually intentionally inflicted by some physical custodian of the child, the expert may not testify that the injuries were in fact caused by any particular person or class of persons engaged in any particular activity or class of activities, nor may he give his opinion as to the defendant's guilt or innocence. Wilkerson, *id.* at 911.

[6] The Court of Appeals touched on this area in *Pruitt v. State,* 164 Ga. App. 247 (1) (296 SE2d 795) (1983). In that case the defendant appealed from his conviction for battering his girlfriend. He contended the trial court had erred in admitting expert testimony of the battered woman syndrome, and the three-judge panel agreed, finding the case was distinguishable from *Smith,* supra, since there was no woman defendant asserting the defense of self defense, nor was there any evidence that the victim was a battered woman, and therefore the battering profile was irrelevant to any material issue. However, the court found the error harmless because Pruitt had been tried by the judge without a jury and it did not appear that the trial court gave any consideration to the expert's testimony. Not discussed was whether Pruitt's character had been impermissibly placed in issue.

characteristics but did not suggest Loebach possessed any of them. However, evidence about Loebach's past was introduced through other witnesses. On appeal the Minnesota Supreme Court found that the testimony about Loebach's personal history and personality was nothing more than character evidence, introduced for the purpose of showing Loebach fit within ten Bensel's battering parent profile, and it held that since Loebach had not placed his character in issue, admission of the testimony was error. The court then announced a prospective rule that the prosecution would not be permitted to introduce evidence of the battering parent syndrome or establish a defendant's character as a battering parent unless the defendant first raised that issue.[7] However, the court went on to rule that there was overwhelming evidence of Loebach's guilt without the battering parent testimony, which was only a small percentage of the evidence, and held the error was not prejudicial.

Turning to the instant case, we find that the disputed portion of Dr. Kennedy's testimony clearly implicated Sanders' character. It matters little that, as the state points out, Kennedy never expressly drew the conclusion that appellant fit his profile of battering parents; his construction of the profile, coupled with the previous testimony that appellant possessed many characteristics which Kennedy's profile identified as being shared by the typical battering parent, could lead a reasonable juror to no other inference than that the state was implying that this parent had a history of violent behavior, and, more importantly, that this parent fit within the syndrome, and had in fact murdered her baby. We hold that unless a defendant has placed her character in issue or has raised some defense which the battering parent syndrome is relevant to rebut, the state may not introduce evidence of the syndrome, nor may the state introduce character evidence showing a defendant's personality traits and personal history as its foundation for demonstrating the defendant has the characteristics of a typical battering parent. Accordingly, the trial court in the instant case erred in admitting the portion of Dr. Kennedy's testimony which was challenged.

However, we find that it is highly probable that the error did not contribute to the verdict, since the evidence of guilt was otherwise overwhelming. *Johnson v. State,* 238 Ga. 59 (230 SE2d 869) (1979). Moreover, we find the error was harmless for the additional reason that testimony covering substantially the same area, including the

---

[7] The court also found without elaboration that its finding was "required until further evidence of the scientific accuracy and reliability of syndrome or profile diagnoses can be established." Loebach, *id.* at 64. This issue is not before us today. See fns. 3 and 4, supra.

testimony about appellant's personal history and most of Dr. Kennedy's testimony, was introduced without challenge. *Bell v. Bell,* 210 Ga. 295 (4) (79 SE2d 524) (1954); *Smith v. State,* 210 Ga. 713 (4) (82 SE2d 507) (1954); *Buford v. State,* 158 Ga. App. 763 (3) (282 SE2d 134) (1981).

4) The trial court charged the jury on the offenses of malice murder, involuntary manslaughter, and battery, but he refused to charge on criminal attempt, assault, aggravated assault, and aggravated battery. In her third enumeration of error appellant complains of these omissions, but this enumeration is without merit. Where the evidence shows a completed crime, there is no error in refusing to charge on attempt or abandonment of attempt. *Smith v. State,* 228 Ga. 293 (1) (185 SE2d 381) (1971). A completed battery was committed, and it was not error to refuse to charge on assault. *Arnett v. State,* 245 Ga. 470 (2) (265 SE2d 771) (1980). Because there was uncontradicted evidence that the victim died, it was not necessary to charge on the lesser included crimes of aggravated assault and aggravated battery. See *Jordan v. State,* 239 Ga. 526 (2) (238 SE2d 69) (1977); *Robinson v. State,* 232 Ga. 123 (3) (205 SE2d 210) (1974); *Johnson v. State,* 164 Ga. App. 429 (1) (296 SE2d 775) (1983).

*Judgment affirmed. All the Justices concur, except Smith and Weltner, JJ., who dissent as to Division 3 and the judgment.*

DECIDED MAY 25, 1983.

*Andrews & Seery, Stephen H. Andrews, Walter E. Van Heiningen,* for appellant.

*H. Lamar Cole, District Attorney, James E. Hardy, Assistant District Attorney, Michael J. Bowers, Attorney General,* for appellee.