COMMONWEALTH *vs.* SCOTT A. DAY.

Essex. January 7, 1991. - April 9, 1991.

Present: LIACOS, C.J., WILKINS, ABRAMS, NOLAN, LYNCH, O'CONNOR, & GREANEY, JJ.

*Evidence,* Relevancy and materiality, Expert opinion. *Child Abuse. Homicide.*

The defendant at a manslaughter trial arising from the death of an eighteen month old child was prejudiced by the judge's admitting expert testimony regarding the characteristics common to individuals who physically abuse children ("child battering profile") where, considering that the defendant's case consisted of seeking to place culpability for the child's death on her mother and not himself, that evidence pointing to the defendant as the abuser was not overwhelming, and that both the child's mother and the defendant had access to the child within the time period in which she died, the "child battering profile" testimony may have contributed to the jury's conclusion that the defendant, and not the mother, was responsible for the child's fatal injuries. [723-726]

INDICTMENT found and returned in the Superior Court Department on June 15, 1988.

The case was tried before *J. Harold Flannery*, J.

The Supreme Judicial Court granted a request for direct appellate review.

*Carol A. Donovan*, Committee for Public Counsel Services, for the defendant.

*S. Jane Haggerty*, Assistant District Attorney, (*Frederick B. McAlary*, Assistant District Attorney, with her) for the Commonwealth.

LIACOS, C.J. The defendant, Scott A. Day, was convicted by a jury of manslaughter. He appealed; his application for direct appellate review was granted by this court. The defendant claims that the judge erred in (1) admitting expert testimony regarding the profile of individuals who physically abuse children, and (2) improperly applying the hearsay rule

to exclude a statement made by the victim's mother.[1] In the view we take, we need not consider the second claim of error. We reverse on the first claim.

We summarize the evidence heard by the jury. The eighteen month old victim was pronounced dead at 2 P.M. on November 8, 1987, at Hale Hospital in Haverhill. Dr. Michael Arnall, a pathologist who performed an autopsy on the body, testified that the victim had several contusions on her head, neck, abdomen, kidneys, legs, and feet. The age of the contusions varied from a few minutes to several days before the victim's death. Dr. Arnall also testified that the victim died as a result of blunt trauma to the head and neck, and that death occurred a few minutes after suffering the fatal injuries, one to three hours after eating a meal, and twelve to twenty-four hours before the child was pronounced dead.

The defendant had moved in with the victim's mother and her four children approximately six months before the victim's death. As a result of the police investigation of the child's death, the defendant provided State Trooper Elaine M. Condon with a signed statement dated November 17, 1987. The entire statement was read by Condon at the trial. According to the statement, on November 7, 1987, the night before the victim was pronounced dead, the defendant fed the children at approximately 6 P.M. At approximately 6:30 P.M., the mother left the apartment, leaving the children in the care of the defendant. Between 7:30 P.M. and 8 P.M., as the defendant was putting the children to bed, a friend stopped by for a visit. The defendant gave the victim medication and put her to bed some time between 8 P.M. and 8:30 P.M. The mother arrived home some time after 1 A.M., and the couple had an argument which lasted approximately twenty minutes. On the morning of November 8, according to the defendant, he removed the child from the crib and immediately realized that she was dead. The defendant then at-

---

[1]The defendant's motion for relief from joinder with his codefendant, the victim's mother, was allowed. In a separate trial the mother was convicted of manslaughter.

tempted to resuscitate the child, while the mother telephoned for an ambulance.

In response to an inquiry by Condon concerning an injury to the mother's hand, the defendant stated that she had hit a wall during an argument; the defendant assured Condon that, "There has never been any physical violence between us." The defendant also told Condon that he had in the past smoked "a little pot" and "dr[a]nk a little." On November 25, 1987, the defendant, during a second interview with Condon, stated that the mother had returned to the apartment at approximately 2 A.M. (contradicting his earlier statement that she had returned at approximately 1 A.M.), and that, after the argument, left again and did not return until 5 A.M. or 5:30 A.M. On May 16, 1988, Condon once again spoke with the defendant and asked him about injuries suffered by the victim during the previous June. The defendant told Condon that he had been "screwed up on drugs" and that he had struck the child with an open hand on the side of her face because she was crying.

Dr. Stephen Bloom and Dr. Stuart Shapira testified that they examined the child on June 16, 1987, and that she had several bruises on her face. The physicians testified that the interaction between the mother and the child seemed to be normal. Both physicians filed reports with the Department of Social Services (department) due to the possibility of child abuse. As a result of the reports, Mabelle Barnette, a social worker with the department, visited the family's apartment on June 18, 1987. Barnette observed that the relationship between mother and child was "good" and "loving" and that there was no "reasonable cause to believe that the child was at risk to abuse and neglect."

The Commonwealth's case closed with the testimony of Dr. Eli Newberger, who testified as an expert on the so-called "battered child syndrome." Dr. Newberger testified about how it is possible to differentiate between injuries which are the result of child abuse, and injuries which are the result of accidents. Dr. Newberger reviewed the victim's

medical records and concluded that the child died as a result of child abuse.

As part of his testimony on battered child syndrome, Dr. Newberger testified, over repeated and strenuous objections by defense counsel, that five "family characteristics" are sometimes associated with child abuse: (1) stress derived from economic hardship and conflict between the parents; (2) isolation of the family; (3) violence against the mother; (4) obtaining medical care from different physicians and hospitals; and (5) singling out of a particular child for abuse. Dr. Newberger also testified, over repeated objections by defense counsel, about the presence of "risk factors" in child abuse cases such as a "repeated pattern" of partners of single mothers who sometimes "offend against [the] children" while the mothers are at work. Dr. Newberger added that another "pattern" recognized in child abuse cases is when a single parent, usually the mother, has several partners who bring alcohol and drugs into the household. Dr. Newberger stated that more than 60% of the cases of child abuse reported to the department "involved" the use of drugs.

The defendant's case consisted of seeking to place culpability for the child's death on the mother and not on himself. A young woman who frequently babysat for the children testified that the mother was sometimes "grouchy" and that she sometimes hit the children. A neighbor testified that she often heard the mother screaming at the children. Finally, included in the hospital records admitted in evidence by the prosecution was a report which stated that the mother told hospital personnel that she fed the child on the morning of November 8, 1987. According to the medical testimony, however, the child had died several hours before.

The defendant argues that the judge erred in allowing Dr. Newberger to testify about the "family characteristics" and "patterns" found in cases of child abuse. The defendant claims that Dr. Newberger's testimony consisted of profile evidence which was irrelevant and highly prejudicial. We agree.

"In determining whether the evidence offered serves any valid purpose we apply the rule that it must merely render the desired inference more probable than it would be without the evidence." *Green* v. *Richmond*, 369 Mass. 47, 59 (1975). See *Commonwealth* v. *Fayerweather*, 406 Mass. 78, 83 (1989); P.J. Liacos, Massachusetts Evidence 409 (5th ed. 1981 & Supp. 1985). The issue whether a "child battering profile" is admissible evidence is one of first impression in Massachusetts. See *Commonwealth* v. *Proulx*, 23 Mass. App. Ct. 985, 986 (1987).

A criminal trial is by its very nature an individualized adjudication of a defendant's guilt or legal innocence. Testimony regarding a criminal profile is nothing more than an expert's opinion as to certain characteristics which are common to some or most of the individuals who commit particular crimes. Evidence of a "child battering profile" does not meet the relevancy test, because the mere fact that a defendant fits the profile does not tend to prove that a particular defendant physically abused the victim. See *State* v. *Brown*, 370 So. 2d 547, 554 (La. 1979) (drug courier profile "does not tend to prove that *this* defendant is guilty of the offense charged, nor does it explain any relevant fact with regard to guilt or innocence"); *Duley* v. *State*, 56 Md. App. 275, 281 (1983) (child battering profile "totally irrelevant because it does not tend to prove that [the defendant] committed the acts of abuse attributed to him"); *State* v. *Maule*, 35 Wash. App. 287, 293 (1983) ("relevancy of [such] evidence is not discernible").

The use of criminal profiles as substantive evidence of guilt is inherently prejudicial to the defendant. See, e.g., *United States* v. *Simpson*, 910 F.2d 154, 158 (4th Cir. 1990) (drug courier profile); *United States* v. *Quigley*, 890 F.2d 1019, 1022-1023 (8th Cir. 1989), cert. denied, 493 U.S. 1091 (1990) (same); *United States* v. *Gillespie*, 852 F.2d 475, 480 (9th Cir. 1988) (child molester profile). Evidence of a "[child battering profile] is highly prejudicial since it invites a jury to conclude that because an expert experienced in child abuse cases identifies an accused as someone fitting a

particular profile, it is more likely than not that this individual committed the crime." *Sloan* v. *State*, 70 Md. App. 630, 638 (1987). We conclude that the admission in evidence of a "child battering profile" is reversible error due to its irrelevance and its inherent prejudicial impact on the defendant.[2]

Testimony involving a "child battering profile" must be distinguished from testimony describing the "battered child syndrome," which both parties in the instant case agree is a proper subject for expert testimony. "[Battered child] syndrome has come to be a well recognized medical diagnosis, dependent on inferences, not a matter of common knowledge, but within the area of expertise of physicians whose familiarity with numerous instances of injuries accidentally caused qualifies them to express with reasonable probability that a particular injury or group of injuries is not accidental or is not consistent with the explanation offered therefor but is instead the result of physical abuse by a person of mature strength" (footnote omitted.) *Commonwealth* v. *Labbe*, 6 Mass. App. Ct. 73, 77 (1978).

The Commonwealth argues that Dr. Newberger's testimony was limited to the issue whether the victim was physically abused by a "person with mature strength," and did not address the profile of individuals who abuse children. Dr. Newberger's testimony regarding a "repeated pattern" of partners of single mothers who sometimes "offend against [the] children" while the mothers are at work constituted profile testimony.[3] The testimony improperly suggested to the

---

[2] See *Sloan* v. *State, supra; Duley* v. *State, supra; State* v. *Steward*, 34 Wash. App. 221, 223-224 (1983). See also *People* v. *Walkey*, 177 Cal. App. 3d 268, 278-279 (1986) (admission of "battering parent syndrome" prejudicial, but error harmless because evidence against defendant strong); *Sanders* v. *State*, 251 Ga. 70, 75-76 (1983) (same); *State* v. *Loebach*, 310 N.W.2d 58, 64 (Minn. 1981) (same).

[3] Dr. Newberger testified "[t]hat very frequently there is a repeated pattern of a mother say who lived with different partners. That also seems to be associated with sometimes those partners having responsibility for the care of children while the mother may go to work, in the absence of adequate child care sometimes those people may offend against children in one or another way."

jury that the defendant physically abused the child simply because he was the mother's partner, and because he was left with the responsibility of caring for the child on the night on which she died. Similarly, Dr. Newberger's testimony regarding the "pattern" of single mothers with several partners who bring drugs into the household was also improper profile testimony since the defendant was a "partner" of a "single mother," and evidence was presented to the jury that the defendant used drugs.[4]

The fact that Dr. Newberger did not specifically state that the defendant fit the profile is not significant, since a reasonable jury could have inferred that the Commonwealth was implying that the defendant fit the "child battering profile," and, as a result, that the defendant was responsible for the child's fatal injuries. See *United States* v. *Quigley, supra* at 1024; *Sanders* v. *State,* 251 Ga. 70, 76 (1983). In the circumstances of this case, where there was evidence that the mother and the defendant argued on the night before the child was found dead, and that the defendant was questioned by the police regarding injuries suffered by the mother, a reasonable jury could have inferred that the evidence was introduced by the Commonwealth to establish *who* abused the child, not *whether* the child was abused. Dr. Newberger's testimony regarding "patterns" and "family characteristics" found in cases of child abuse was improper profile testimony and the judge erred in allowing its admission in evidence.

The Commonwealth argues that, if the judge committed error in admitting Dr. Newberger's testimony, the error was harmless since it was highly unlikely that Dr. Newberger's testimony "contributed to the verdict, particularly in light of

---

[4]Dr. Newberger testified that "[b]etween the changes in the families where the single parent, usually the mother, is responsible for the children, and sometimes not one but a series of partners of the mother may have, and into the presence of psycho active substances, alcohol, drugs, of various kinds, we very often see a prescription for very serious danger to children and in many cases the Massachusetts Department of Social Services estimates that in excess of 60 percent [objection overruled] of the case reports drugs are also involved. These are the latest family findings with regard to this changing pattern of child physical abuse."

the Commonwealth's very persuasive evidence of guilt." We disagree. While there was persuasive evidence that the child died from "battered child syndrome," the evidence pointing toward the defendant as the abuser was not overwhelming. According to Dr. Arnall, the child died between 2 P.M. and 2 A.M. The strongest evidence against the defendant was his own statement that he had exclusive access to the child between 6:30 P.M. and 1 A.M.[5] The mother, however, returned home between 1 A.M. and 2 A.M. Both the mother and the defendant, therefore, had access to the child within the time period in which she died. While the defendant admitted to the police that he had hit the child in the past, there was also testimony from the babysitter that she saw the mother hit the children. We conclude that the highly prejudicial profile testimony may have contributed to the jury's conclusion that the defendant, and not the mother, was responsible for the child's fatal injuries.[6] Therefore, we cannot say that the defendant was not prejudiced.

The judgment is reversed, the verdict is set aside, and the case is remanded for a new trial.

*So ordered.*

---

[5]There is no evidence or allegation that the defendant's friend who visited him on the night of November 7, 1987, harmed the child.

[6]The improper prejudicial impact of Dr. Newberger's profile testimony was reinforced during closing arguments when the prosecutor, while trying to explain why the mother might have lied about her having fed the child on the morning of November 8, 1987, reminded the jury of "Doctor Newberger's testimony and the factors of the typical child abuses he referred to. And one of those, I suggest, or some of those, I suggest, is a fact that many of these cases happen in broken homes where there's a mother and a boyfriend [objection overruled] and on many of these occasions the mother, in an attempt to cover up, makes some alibis."