798 S.E.2d 584

The STATE, Respondent,

v.

Alexander Carmichael HUCKABEE, III, Appellant.

Appellate Case No. 2013-001409
Opinion No. 5473

Court of Appeals of South Carolina.

Heard October 12, 2016
Filed March 15, 2017
Rehearing Denied April 21, 2017

416

Appellate Defender John Harrison Strom, of Columbia, for Appellant.

418

Attorney General Alan McCrory Wilson, Assistant Attorney General Mary Williams Leddon, and Assistant Attorney General William Frederick Schumacher, IV, all of Columbia; and Solicitor William Benjamin Rogers, Jr., of Bennettsville, for Respondent.

GEATHERS, J.:

Appellant Alexander Huckabee, III seeks review of his convictions for homicide by child abuse (HCA), inflicting great bodily injury upon a child, unlawful conduct toward a child, and first-degree criminal sexual conduct (CSC) with a minor. Appellant assigns error to the trial court's admission of the testimony of a witness proffered as an expert in criminal behavioral analysis, arguing the witness's criminal profiling testimony (1) was excludable under Rule 403, SCRE, (2) was based on an unreliable methodology, (3) was given by an unqualified witness, and (4) usurped the jury's role as sole fact finder. Appellant also challenges the admission of his third statement to police because (1) law enforcement did not "re-*Mirandize*"[1] him after a three-day lapse following his previous custodial interrogation and (2) the interrogation was given under additional coercive conditions. We affirm in part, reverse in part, and remand.

## FACTS/PROCEDURAL HISTORY

Atelia Hunt was living with Appellant in Bennettsville on October 6, 2011, when Hunt took her three-year-old daughter (Victim) to the local hospital's emergency room at approximately 9:45 p.m., complaining that Victim was not breathing. Linda Hooper, one of the nurses on duty, called a "code team" to attempt to revive Victim, but tragically, the attempt was unsuccessful. Hooper noticed Victim had several bruises and burn marks all over her body and her head had been shaved. Dr. Cynthia Schandl performed Victim's autopsy and reported the cause of death as a "massive" blood infection that started as a urinary tract infection, traveled to Victim's bladder and kidneys, and ultimately entered into her blood.

---

1. *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

Sergeant John Hepburn and Lieutenant Larry Turner of the Bennettsville Police Department conducted videotaped interviews of several witnesses, including Hunt and Appellant. Appellant's interview lasted approximately thirty to forty minutes, beginning on October 7, 2011, at 12:42 a.m. At that time, Appellant was not a suspect in Victim's death or injuries. Sergeant Hepburn, nonetheless, provided Appellant his *Miranda* rights in writing prior to questioning him, and Appellant signed the waiver of rights near the bottom of the form. Hunt and Appellant were later arrested in connection with Victim's death and injuries.

Lieutenant Turner also assisted Lieutenant Kathy Bass, an agent with the South Carolina Law Enforcement Division (SLED), in conducting a second interview of Appellant at the Bennettsville Detention Center on October 10, 2011, at approximately 10:45 a.m. Lieutenant Bass went over a *Miranda* form with Appellant, reading him his rights, and Appellant signed the waiver of rights near the bottom of the form. This interview, which was not recorded, lasted approximately one and one-half hours. Near the conclusion of the interview, Lieutenant Bass asked Appellant to submit a voluntary handwritten statement. Appellant began writing but stopped after two or three sentences. Lieutenant Bass then asked Appellant if he would be willing to meet with her at a later date at the Bennettsville Police Department so that his statement could be videotaped in lieu of being handwritten. Appellant agreed and met with Lieutenant Bass again on October 13, 2011.

At the beginning of the October 13 interview, Lieutenant Bass reminded Appellant that she had given him written *Miranda* warnings at their previous meeting. She also gave verbal *Miranda* warnings but skipped over the right to counsel. According to the prosecutor, this third interview lasted approximately four hours.[2]

Appellant was indicted for HCA,[3] inflicting great bodily injury upon a child, unlawful conduct toward a child, and first-

---

2. In his brief, Appellant estimates the third interview lasted "nearly three hours."

3. Appellant was indicted under the principal provision of the HCA statute, section 16-3-85(A)(1) of the South Carolina Code (2015), rather

degree CSC with a minor. Prior to Appellant's trial, Hunt pled guilty to unlawful conduct toward a child and to HCA under the aiding and abetting provision of the HCA statute.

At Appellant's trial, Dr. Schandl testified that when she examined Victim, she discovered areas of Victim's brain in which blood clots had cut off the blood supply, ultimately causing brain death. Dr. Schandl explained that this process began approximately one week prior to Victim's death and would have caused Victim to feel fatigued. Victim also would have been difficult to arouse, she might have had a suppressed appetite, and she might not have walked as comfortably as she normally would have. Dr. Schandl stated it was highly unlikely that Victim would not have had those symptoms during her last week. Dr. Schandl also stated Victim might have experienced seizures and would have eventually fallen into a coma.

Dr. Schandl then described the symptoms Victim might have exhibited at the beginning of her urinary tract infection: burning upon urination, urinating more often, leakage, and blood in the urine. As the infection spread to Victim's kidneys, she might have experienced back pain, and as the infection went into Victim's blood, she would have experienced fever, chills, and sweating. Dr. Schandl stated that based on the progression of symptoms, it would have become obvious that Victim was very sick.

Dr. Schandl also found a hemorrhage approximately one centimeter inside Victim's vagina, which made her suspicious of a sexual encounter. She noticed cigarette burns and bruises on Victim as well. The burns were in varying stages of healing, and some of them were "more round" than others, indicating Victim was still when she experienced those burns. Dr. Schandl further testified Victim was missing two front teeth. She found this to be strange because Victim was three years old and children "don't start losing their teeth until they are six or seven."

The trial court admitted into evidence Appellant's third statement, in which he admitted that, on one occasion, he "popped" Victim for "messing with [a] wall socket" and the impact left a bruise. He also admitted he should have sought

than the aiding and abetting provision of the statute, section 16-3-85(A)(2).

help for Victim and should have insisted that Hunt take Victim to the hospital earlier than she did. However, Appellant consistently denied inflicting the cigarette burns on Victim and instead implicated Hunt. He stated he asked Hunt about the burns and she told him they were blisters. He also stated Hunt performed an internet search on how to heal burns. When asked about the hemorrhage inside Victim's vagina, Appellant stated he did not know what caused the hemorrhage. Despite the lengthy questioning by Lieutenant Bass, Appellant remained strong-willed in his responses.

Hunt testified Victim's bruising was caused by Appellant grabbing Victim by her ankles, as she was standing in front of him, and trying to separate her legs to "make her do a split." She asserted Appellant explained Victim's bruises by stating he and Victim were "playing too hard" and "she ran up against the table or she had [fallen]." Hunt also stated whenever she would try to take Victim to a doctor during the last week of her life, Appellant would tell her to wait until Victim's bruises healed so they could avoid being reported to the Department of Social Services (DSS).

According to Hunt, when she noticed blood on a burgundy towel, Appellant explained it as an accident in which Victim had been climbing on a chair and hit her crotch on it. Hunt also claimed she asked Appellant about burn marks on Victim and Appellant told her to search the Internet to determine what to use on burns to heal them. Hunt further testified she lied to police during her interrogation because Appellant told her "to be quiet and that he'll take care of everything, and that he'll let them know what had happened."

When Appellant testified, he characterized Hunt as dishonest and controlling. He stated Hunt lied to him about her financial circumstances when they first met.[4] He admitted he should have done something to help Victim. However, he later stated he did not know Victim was as sick as she was. He also stated he was afraid DSS would take his seven-year-old son away from him if he sought medical help for Victim. However, he denied ever touching the inside of Victim's vagina.

---

4. Hunt admitted that when she first met Appellant, she lied to him about owning her parents' residence.

SLED agent Paul LaRosa gave expert testimony concerning the characteristics of individuals who sexually abuse children. He focused specifically on the infliction of cigarette burns near Victim's vagina and on her buttocks, characterizing this behavior as sexual. The State proffered Agent LaRosa as an expert in "Crime Analysis and Crime Scene Reconstruction." The State clarified that the area of Crime Analysis included profiling: "[J]ust to make sure the record is clear[, w]hen I say Crime Analysis, that would be slash Profiler."

The trial court qualified Agent LaRosa and admitted his testimony "in the area of Criminal Behavioral Analysis and Crime Scene Reconstruction." Agent LaRosa described his work as a criminal profiler at SLED in the following manner:

> The bulk of the work that we do when it comes to violent crimes or cases like this, where we get the agency who comes to us and says, we have had a crime, and the crime is [sic]. We know who the potential suspects are. And we need some help because of the nature of the crime, the violence of the crime, and the bazaar [sic] behavior in the crime. We need help. We need help from [the] interview stand point [sic]. Evidence collection. How to prosecute this case. What to charge them with.[5]

Agent LaRosa stated a person who inflicts well-defined cigarette burns on a three-year-old child would have to be someone who had complete control over the child over a long period of time. Notably, this specific testimony was based on Agent LaRosa's experience as a crime scene reconstructionist. He then gave his criminal profiling testimony, stating that the overwhelming majority of sexual offenders are male. His profile of an individual who would inflict cigarette burns near the victim's vagina was simply an adult male, approximately twenty-five to forty years of age. As of October 13, 2011, one week after Victim's death, Appellant was twenty-nine years of age.

The jury returned guilty verdicts against Appellant on the charged offenses. He was sentenced to life imprisonment for HCA and concurrent terms of (1) life imprisonment for first-degree CSC with a minor, (2) twenty years for inflicting great

---

5. Appellant and Hunt were known suspects when Agent LaRosa was engaged to work on the present case.

bodily injury upon a child, and (3) ten years for unlawful conduct toward a child. This appeal followed.

## LAW/ANALYSIS

### Rule 403, SCRE

Appellant argues Agent LaRosa's criminal profiling testimony was excludable under Rule 403, SCRE, because the testimony suggested Appellant's guilt on an improper basis, and therefore, the danger of unfair prejudice outweighed any possible probative value. We agree.

" 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Rule 401, SCRE. Rule 403 states, in pertinent part, "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice...." "Unfair prejudice means an undue tendency to suggest a decision on an improper basis." *State v. Lyles*, 379 S.C. 328, 338, 665 S.E.2d 201, 206 (Ct. App. 2008) (quoting *State v. Gilchrist*, 329 S.C. 621, 627, 496 S.E.2d 424, 427 (Ct. App. 1998)). "When juxtaposing the prejudicial effect against the probative value, the determination must be based on the entire record and will turn on the facts of each case." *Id.* "A trial [court's] decision regarding the comparative probative value and prejudicial effect of evidence should be reversed only in exceptional circumstances. We review a trial court's decision regarding Rule 403 pursuant to the abuse of discretion standard and are obligated to give great deference to the trial court's judgment." *State v. Collins*, 409 S.C. 524, 534, 763 S.E.2d 22, 28 (2014) (citation omitted) (quoting *State v. Adams*, 354 S.C. 361, 378, 580 S.E.2d 785, 794 (Ct. App. 2003)).

We conclude the nature of the challenged testimony in the present case presents exceptional circumstances. Criminal profiling testimony is not probative of an individual defendant's guilt in a particular case. *See Commonwealth v. Day*, 409 Mass. 719, 569 N.E.2d 397, 399 (1991) (holding that evidence of a "child battering profile" did not meet the test for relevance because the mere fact that a defendant fit the

profile did not establish that a particular defendant physically abused the victim); *State v. Clements*, 244 Kan. 411, 770 P.2d 447, 454 (1989) (examining and adopting case law from Arkansas, Washington, and Vermont and stating the thrust of these opinions "is that (1) evidence [that] only describes the characteristics of the typical offender has *no relevance* to whether the defendant committed the crime in question; and (2) the only inference [that] can be drawn from such evidence, namely that a defendant who matches the profile must be guilty, is an impermissible one" (emphasis added)); *see also United States v. Jones*, 913 F.2d 174, 177 (4th Cir. 1990) (holding the trial court abused its discretion in admitting expert testimony of drug profiles as substantive evidence of the defendant's guilt); *id.* ("This is not a case in which evidence of the drug profile was used as purely background material to explain why the defendant was stopped.... Rather, it is a case in which the government attempted to establish the defendant's guilt by showing that he has the same characteristics as a drug courier. The use of the drug courier profile in this manner is clearly impermissible." (citations omitted)); *id.* ("[T]he use of expert testimony as substantive evidence showing that the defendant 'fits the profiles and, therefore, must have intended to distribute the cocaine in his possession' is error." (quoting *United States v. Quigley*, 890 F.2d 1019, 1023–24 (8th Cir. 1989))).

In *Commonwealth v. Day*, the Supreme Judicial Court of Massachusetts reversed the defendant's manslaughter conviction due to the superior court's admission of expert testimony regarding the profile of individuals who physically abuse children. 569 N.E.2d at 397. The testimony included the expert's opinion that a risk factor in child abuse cases was a repeated pattern of partners of single mothers who sometimes offend against children while the mothers are at work. *Id.* at 398–99. The court explained that the testimony "improperly suggested to the jury that the defendant physically abused the [victim] simply because he was the mother's partner[ ] and because he was left with the responsibility of caring for the child on the night [that] she died." *Id.* at 400. The court found the expert's forbearance from stating the defendant fit the profile was insignificant because "a reasonable jury" could have interpreted the testimony as a suggestion that the defendant "fit the

'child battering profile,' " and "was responsible for the child's fatal injuries." *Id.*

While criminal profiling may have a legitimate function in law enforcement investigations, such information constitutes propensity evidence and, therefore, has no place in a trial to determine the guilt of a specific individual. In other words, this type of testimony unduly tends "to suggest a decision on an improper basis." *Lyles,* 379 S.C. at 338, 665 S.E.2d at 206 (quoting *Gilchrist,* 329 S.C. at 627, 496 S.E.2d at 427); *cf.* Rule 404(a), SCRE ("Evidence of a person's character or a trait of character is not admissible for the purpose of proving action in conformity therewith on a particular occasion. . . ."); *State v. Nelson,* 331 S.C. 1, 4–5, 7, 501 S.E.2d 716, 717–19 (1998) (holding that the admission of children's toys, videos, and photographs depicting young girls, all seized from the defendant's bedroom, invited the jury to infer the defendant was acting in conformity with being a pedophile when he allegedly committed the crimes with which he was charged and stating, "Because this is an improper basis upon which to determine guilt, the evidence should not have been admitted"); *State v. Peake,* 302 S.C. 378, 380, 396 S.E.2d 362, 363 (1990) ("Evidence of prior criminal acts [that] are independent and unconnected to the crime for which an accused is on trial is inadmissible *for purposes of proving that the accused* possesses a criminal character or *has a propensity to commit the crime with which he is charged.*" (emphases added)).

One neighboring jurisdiction has also condemned criminal profiling testimony as propensity evidence. In *Sanders v. State,* 251 Ga. 70, 303 S.E.2d 13, 18 (1983), the Supreme Court of Georgia held,

[U]nless a defendant has placed her character in issue or has raised some defense [that] the battering parent syndrome is relevant to rebut, the state may not introduce evidence of the syndrome, nor may the state introduce character evidence showing a defendant's personality traits and personal history as its foundation for demonstrating the defendant has the characteristics of a typical battering parent.

The court explained that, in the case before it, the expert's construction of a profile of the typical abusive parent, coupled

with previous testimony showing the appellant possessed many characteristics within the profile, "could lead a reasonable juror to no other inference than ... this parent ... had in fact murdered her baby." *Id.* "It matters little that, as the state points out, [the expert] never expressly drew the conclusion that [the] appellant fit his profile of battering parents...." *Id.* The court concluded the trial court erred in admitting the portion of the expert's testimony constructing a profile of the typical abusive parent. *Id.* While the court ultimately concluded the error was harmless in light of the overwhelming evidence against the appellant,[6] the present case is distinguishable as to the harmless error analysis. *See infra.*

We note our own supreme court indirectly addressed profiling testimony as potential propensity evidence in *Underwood v. State*, 309 S.C. 560, 563–64, 425 S.E.2d 20, 22–23 (1992).[7] In *Underwood*, the State's expert offered her "profile" testimony to explain why she found only a small tear in the hymen of one of the victims. 309 S.C. at 563, 425 S.E.2d at 22. This testimony merely explained the behavior of people who sexually abuse children and its effect on the victim's injuries—the expert stated,

> If you hurt a child very badly, that child is going—another adult is going to find out more likely. The child isn't going to come back, and you will be discovered. Therefore, many people who want to be sexually involved with children are careful of the children with whom they become sexually involved.

*Id.* Our supreme court held the defendant's trial counsel was not ineffective for failing to object to this testimony because it was not offered to identify the defendant as the offender. *Id.* at 564, 425 S.E.2d at 23.

In contrast, in the present case, the only testimony necessary to explain how Victim's cigarette burns were inflicted was the testimony based on Agent LaRosa's experience as a crime

---

6. *Id.*

7. Also, in *State v. Tapp*, the court held the trial court erred in admitting criminal profiling testimony without first determining whether it was reliable but declined to address the testimony's reliability. 398 S.C. 376, 387 & n.11, 728 S.E.2d 468, 474 & n.11 (2012).

scene reconstructionist. Yet, Agent LaRosa's profiling testimony went further to specifically target an adult male between the ages of twenty-five and forty as the likely perpetrator of this type of abuse. While this testimony was not *expressly* offered to identify Appellant as the perpetrator, "[i]t matters little that ... [Agent LaRosa] never expressly drew the conclusion that [A]ppellant fit his profile...." *Sanders*, 303 S.E.2d at 18. Agent LaRosa's profiling testimony "could lead a reasonable juror to no other inference than" Appellant inflicted the burns and, therefore, had a propensity to commit the sexual battery resulting in Victim's hemorrhage.[8] *Id.*

The purported reason for the State seeking Agent LaRosa's expertise and presenting his testimony was to answer the question of "How could anyone do this to a child?" Yet, the only practical reason for the State to present the answer to this question would be to suggest that Appellant fit the profile of a person who would inflict this type of abuse and, therefore, he must have inflicted the burns and the sexual battery. This is evident in the trial court's Rule 403 analysis, Agent LaRo-

---

8. "A person is guilty of [CSC] with a minor in the first degree if the actor engages in sexual battery with a victim who is less than eleven years of age...." S.C. Code Ann. § 16-3-655(A)(1) (2015). "Sexual battery" for purposes of first-degree CSC with a minor is defined as "sexual intercourse, cunnilingus, fellatio, anal intercourse, or any intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of another person's body, except when such intrusion is accomplished for medically recognized treatment or diagnostic purposes." S.C. Code Ann. § 16-3-651(h) (2015). In arguing against Appellant's directed verdict motion as to the CSC charge, the solicitor recounted what he believed to be the circumstantial evidence of Appellant's guilt:

I will start by highlighting Dr. Schandl's testimony as it relates to the injury inside ... [Victim's] vagina, which she indicated was consistent with a sexual assault. She specifically said that on questioning by the State. Additionally, when you put that in the circumstances in [its] totality as to what is evidence, as to what was going on in that house, who had access to the child ... that also adds a particular circumstance.

And then finally ... we had *[Agent LaRosa's] testimony as it relates to the Profiler. Remind you, not pointing out [Appellant], we understand that that was not the purpose of his testimony. But when you put that with the other circumstances, I think there is at least enough evidence for the jury to consider—whether to consider it as it relates to the guilt of [Appellant] on the CSC charge.*

(emphases added).

sa's own testimony, and the questions posed by the State to Agent LaRosa. The trial court conducted the following Rule 403 analysis:

[T]he [c]ourt finds that the jury here is confronted with basic questions. How could anyone do this to a child? Clearly if these wounds are not self-inflicted, these are cigarette burns, and that is the, I guess, the real evidence here, is the State's attempt to prove that [Appellant] did it. That's what brings us here. But the jury has to be wondering how could such a thing occur.

And the [c]ourt finds that this is a core concern. It's really something we haven't discussed yet. I'm sure it will come out in closing about how anyone could do this. How could this type of crime be committed? Clearly the crime was committed here. I'm not saying that [Appellant] did it, but someone did, because again these wounds cannot [be] self-inflicted.

And so, the [c]ourt finds that this type of behavioral analysis to assist the jury in bringing an understanding to what really is a core issue, so I find it highly probative.

I also find that it is not unfairly prejudicial *for the State to put up evidence that would show that [Appellant] would have attempted to have committed the crime.* That's what would be expected by the defense that the State would be putting in that type of evidence.

And *thus, his comments that this would be done by a male* and that has a sexual component to it, the [c]ourt does not find that overly prejudicial.

(emphases added).

Further, in his explanation of how he became involved in the present case, Agent LaRosa stated,

[W]e were not asked to say who was the individual [who] harmed [Victim], we were asked what is it, first of all. Because it was bazaar [sic] and very violent. And we were asked why would somebody do this. What are the most likely characteristic[s] of a person [who] would do this and harm [Victim] this way.

The State later specifically asked Agent LaRosa to relay his findings regarding the perpetrator's age and gender, to which Agent LaRosa responded that the "overwhelming percentage

of the gender of a sexual assault on a child is going to be male" and that he "would be telling the local authorities that [they] would be looking for an adult male, approximately the age of [twenty-five] to forty."

■ Based on the foregoing, the present case is distinguishable from *Underwood*. Here, Agent LaRosa's profiling testimony had no probative value, and the danger of unfair prejudice to Appellant was high due to the testimony's tendency to suggest Appellant's guilt on an improper basis. Therefore, the testimony should have been excluded under Rule 403, SCRE.

## Harmless Error

The State contends the admission of Agent LaRosa's testimony was harmless beyond a reasonable doubt because (1) his testimony regarding the burn marks was "largely cumulative" to Dr. Schandl's testimony and (2) there was "substantial evidence" of Appellant's guilt.

■ "Whether an error is harmless depends on the circumstances of the particular case. No definite rule of law governs this finding; rather, the materiality and prejudicial character of the error must be determined from its relationship to the entire case." *State v. Chavis*, 412 S.C. 101, 109–10, 771 S.E.2d 336, 340 (2015) (citation omitted). For example, "[a police] officer's improper opinion [that] goes to the heart of the case is not harmless." *State v. Ellis*, 345 S.C. 175, 178, 547 S.E.2d 490, 491 (2001).[9] In *Ellis*, the supreme court reversed the trial court's ruling that allowed a police officer qualified as an expert in crime scene processing to exceed the scope of his expertise by imparting to the jury his conclusion, drawn from measurements taken at the scene, regarding the victim's location and body position. 345 S.C. at 177–78, 547 S.E.2d at 491. The court explained,

In effect, [the police officer] was allowed to give his opinion on the ultimate issue: Whether [the] appellant was acting in self-defense when he shot and killed the victim. This was error. *See* Rule 704, SCRE; *State v. Wilkins*, 305 S.C. 272,

---

9. *See also Tapp*, 398 S.C. at 393, 728 S.E.2d at 477 (Pleicones, J., dissenting) ("Improper 'expert' evidence [that] goes to the heart of the case is not harmless.").

407 S.E.2d 670 (Ct. App. 1991) (opinion may be offered on ultimate issue only where witness is otherwise qualified). *Id.* at 178, 547 S.E.2d at 491.

The court held the error could not be deemed harmless in light of the appellant's assertion that he was acting in self-defense. *Id.* The court further stated the error was compounded by the solicitor's closing argument, in which he referenced the " 'scientific' testimony of [the officer], 'an expert qualified by the judge.' " *Id.* "The trial court's imprimatur of [the officer] as an 'expert' was exploited by the solicitor to the prejudice of [the] appellant and his defense." *Id.*

In the instant case, the State conceded at trial that there was no direct evidence of Appellant's guilt as to the CSC charge and Agent LaRosa's testimony was part of the circumstantial evidence presented to support that charge. Further, there was no other evidence covering the most damning part of Agent LaRosa's testimony—targeting an adult male between the ages of twenty-five and forty as the likely perpetrator as to Victim's burns and his general statement that the overwhelming majority of sexual assaults on children are inflicted by males. Dr. Schandl's testimony concerning the burn marks merely alluded to the burns being inflicted (1) intentionally rather than accidentally and (2) over a sustained period of time due to the varying stages of healing among the several burns. Similarly, her testimony regarding the vaginal hemorrhage did not place limits on how the underlying trauma was inflicted other than that it was likely sexual in nature. This left open the possibility that Hunt, rather than Appellant, was the perpetrator.[10] In stark contrast, Agent LaRosa's testimony excluded Hunt as the likely perpetrator when it limited the class of possible suspects to adult males. This went to the heart of Appellant's defense that Hunt inflicted the abuse and that her testimony against him was not credible.

Moreover, the State presented Agent LaRosa's testimony immediately after presenting Hunt's testimony, during which Appellant's counsel significantly undermined Hunt's credibility

---

**10.** We are mindful of the State's reference to evidence showing Appellant was the only smoker in the household. However, this evidence does not exclude Hunt as the perpetrator in the absence of evidence demonstrating Hunt was prevented from accessing Appellant's cigarettes.

on cross-examination. Agent LaRosa's profiling testimony made it easy for the jury to view Hunt as generally more credible than Appellant and, thus, to choose Hunt's account of the events preceding Victim's death over Appellant's conflicting account. In his closing argument, the prosecutor compounded the prejudice by following up his contrast of Appellant's credibility against Hunt's credibility with a glowing review of Agent LaRosa's profiling testimony, emphasizing his training "with the Federal Bureau of Investigation, the chief law enforcement agency in the United States of America in this particular field." In sum, the jury was prevented from conducting an uncontaminated assessment of the comparative credibility of Hunt and Appellant due to what Appellant describes as Agent LaRosa's "speculat[ion], under the guise of court-sanctioned expertise, on what kind of person would inflict" the cigarette burns on Victim.

Other jurisdictions evaluating similar circumstances in the conduct of criminal trials have declined to hold that the admission of improper profile testimony was harmless. *See, e.g., People v. Robbie,* 92 Cal.App.4th 1075, 112 Cal.Rptr.2d 479, 487–88 (2001) (declining to characterize the admission of improper profile testimony concerning a particular type of sex offender as harmless and citing to the "starkly conflicting versions of events" given by the defendant and the victim and to the prosecutor's emphasis on the profiling testimony in his closing argument); *id.* at 488 (setting forth the circumstances rendering the admission of improper profile testimony reversible: "[T]he jury's verdict depended largely on whether it found [the victim] or the defendant more credible. [The victim's] credibility had been directly attacked but was significantly bolstered by the expert's testimony."); *Clements,* 770 P.2d at 454–55 (declining to hold the admission of improper profile testimony was harmless "[g]iven the highly prejudicial nature of the expert testimony and the prosecutor's comments in closing argument").

In *Commonwealth v. Day,* the Supreme Judicial Court of Massachusetts held the error in admitting evidence of a "child battering profile" was not harmless because the evidence of the defendant's guilt was not overwhelming. 569 N.E.2d at 400–01. The court noted both the defendant and the mother had access to the victim during the time period in which she

died. *Id.* at 401. The court also noted that, although the defendant admitted to police he had hit the victim in the past, a babysitter testified to seeing the mother hit the children. *Id.* Therefore, the court concluded the profiling testimony may have contributed to the jury's conclusion that the defendant was responsible for the victim's injuries. *Id.*

Here, with the exception of unlawful conduct toward a child, the evidence of Appellant's guilt is not so overwhelming as to render the admission of Agent LaRosa's profiling testimony harmless, especially given the credibility problems with Hunt's testimony. On this basis, we reverse Appellant's convictions for first-degree CSC with a minor, inflicting great bodily injury upon a child, and HCA. Therefore, we need not reach the remaining challenges to the trial court's admission of Agent LaRosa's testimony. *See State v. Bostick*, 392 S.C. 134, 139 n.4, 708 S.E.2d 774, 776 n.4 (2011) (declining to address a remaining evidentiary issue when the court's decision on the first issue was dispositive); *Futch v. McAllister Towing of Georgetown, Inc.*, 335 S.C. 598, 613, 518 S.E.2d 591, 598 (1999) (providing that an appellate court need not address remaining issues when resolution of a prior issue is dispositive).

■■■ As to Appellant's conviction for unlawful conduct toward a child, the admission of Agent LaRosa's profiling testimony was harmless in light of the other overwhelming evidence of guilt. *See Chavis*, 412 S.C. at 110 n.7, 771 S.E.2d at 340 n.7 (explaining that the trial court's error in admitting certain testimony was harmless "because there [was] other overwhelming evidence of guilt"). Section 63-5-70(A) of the South Carolina Code (2010) defines unlawful conduct toward a child in the following manner,

It is unlawful for a person who has charge or custody of a child, or who is the parent or guardian of a child, or who is responsible for the welfare of a child as defined in Section 63-7-20 to:

(1) *place the child at unreasonable risk of harm* affecting the child's life, physical or mental health, or safety;

(2) do or cause to be done unlawfully or maliciously any bodily harm to the child so that the life or health of the child is endangered or likely to be endangered; or

(3) wil[l]fully abandon the child.

(emphasis added). " 'Person responsible for a child's welfare' includes ... an adult who has assumed the role or responsibility of a parent or guardian for the child, but who does not necessarily have legal custody of the child." S.C. Code Ann. § 63-7-20(16) (2010).

Appellant's own testimony showed he assisted in Victim's care during the two months she lived with him before she died. Dr. Schandl testified that as Victim's urinary tract infection eventually made its way into her blood, she would have experienced fever, chills, and sweating. Dr. Schandl explained that the process of blood clots cutting off the blood supply to Victim's brain began approximately one week prior to her death and this would have caused her to feel fatigued. Dr. Schandl also explained that Victim would have been wobbly and difficult to arouse and she might have had a suppressed appetite as well as difficulty reacting to people talking to her. Dr. Schandl stated it was highly unlikely that Victim would not have had these symptoms during her last week.

Dr. Schandl also stated that based on the progression of symptoms, it would have become obvious that Victim was very sick. Appellant admitted on direct examination that he should have done something to help Victim, and his subsequent testimony that he did not know Victim was as sick as she was necessarily implied he knew Victim was sick to some degree. Moreover, Appellant admitted he was afraid DSS would take his son away if he sought medical help for Victim.

Because Dr. Schandl's testimony and Appellant's own admissions overwhelmingly support his conviction for unlawful conduct toward a child, we affirm this conviction.

**Third Statement to Police**

Finally, as to Appellant's challenge to the admissibility of his third statement, we affirm pursuant to Rule 220(b), SCACR, and the following authorities: *State v. Moses*, 390 S.C. 502, 513, 702 S.E.2d 395, 401 (Ct. App. 2010) ("[T]he test for determining whether a defendant's confession was given freely, knowingly, and voluntarily focuses upon whether the defendant's will was overborne by the totality of the circumstances surrounding the confession."); *State v. Goodwin*, 384 S.C. 588, 601, 683 S.E.2d 500, 507 (Ct. App. 2009) ("When reviewing a

trial [court's] ruling concerning voluntariness, the appellate court does not re-evaluate the facts based on its own view of the preponderance of the evidence, but simply determines whether the trial [court's] ruling is supported by any evidence." (quoting *State v. Miller*, 375 S.C. 370, 378–79, 652 S.E.2d 444, 448 (Ct. App. 2007))).

## CONCLUSION

Accordingly, we reverse Appellant's convictions for first-degree CSC with a minor, inflicting great bodily injury upon a child, and HCA and remand for a new trial on these charges. We affirm Appellant's conviction for unlawful conduct toward a child.

**AFFIRMED IN PART, REVERSED IN PART, and REMANDED.**

WILLIAMS and THOMAS, JJ., concur.