### 1685

The STATE, Respondent v. Alice Postell WILKINS, Appellant.

(407 S.E. (2d) 670)

Court of Appeals

*Coming B. Gibbs, Jr.,* and *Mary B. Webb, Gibbs & Holmes,* Charleston, and *S.C. Office of Appellate Defense,* Columbia, *for appellant.*

*Attorney Gen. T. Travis Medlock, Chief Deputy Atty. Gen. Donald J. Zelenka,* and *Staff Atty. E. Jean Howard, Sp. Prosecutors Warren B. Giese* and *Jonathan S. Gasser,* Columbia, *for respondent.*

Heard May 13, 1991; Decided Aug. 5, 1991.

Rehearing Denied Aug. 29, 1991.

BELL, Judge:

On February 7, 1989, Alice Postell Wilkins shot and killed William Legree Ferrell in a car on Rushland Landing Road in Charleston County. She was indicted and tried for murder in the Court of General Sessions. The jury found her guilty of voluntary manslaughter for which the court sentenced her to twenty years imprisonment. She appeals her conviction. We reverse and remand.

At trial Wilkins admitted killing Ferrell, but claimed she acted in self defense. The State contended the killing was premeditated. As a critical part of her evidence, Wilkins attempted to introduce expert testimony that she suffered from battered woman's syndrome and when she shot Ferrell she was in reasonable fear of her life. The trial judge refused to allow this evidence as going to an ultimate fact in the case. Wilkin's evidence showed that she and Ferrell had been romantically involved for about a year before the shooting. They often went drinking together. Ferrell became very jealous of her after she became intimate with him. He had a reputation in the community for violence. He was often threatening, abusive, and violent toward her. On more than one occasion he pointed a gun at her. There were also several times when he struck her and other times when he threatened her life. Wilkins reported these incidents to the police. She testified that in late October, 1988, she called the Assistant Circuit Solicitor and told him:

> I was at wit's end about what to do with Billy Ferrell. I told him that I had repeatedly broken off with him, told him to go away, leave me alone. I had repeatedly con-

tacted the police, made reports against him, signed warrants against him, put him in jail. He always managed to get out of jail and come back to me. And I just didn't know what to do. And I begged for his help.

In late January, 1989, she called the police and requested that they patrol her area to protect her from Ferrell.

On Friday, February 3, 1989, Ferrell telephoned Wilkins and told her he was trying to leave town because the police were looking for him. He wanted to meet with her and say goodbye. She agreed to meet him. According to her testimony, from the time they met on Friday until she shot him on the following Tuesday, he would not let her go. He insisted that she help him get money to leave town, but then spent the money on drink. When she tried to leave him on Monday he grabbed her and told her that if she didn't finish helping him to get enough money to leave town, he would kill her. She believed him.

About midday Tuesday, Wilkins persuaded Ferrell to take her to her mother's house to leave a note, so her mother would not report her missing to the police. She testified he told her he knew she was trying to get away from him, but he would let her go into the house if she would bring him a set of handcuffs that were there. If she did not hurry, he would come inside and kill her. While in the house, she took a pistol and tucked it into the back of her waistband. She returned to the car where Ferrell was waiting. For a time he drove along back roads on Johns Island near Charleston. Ferrell had been drinking heavily all morning. He continued drinking and playing with a knife he had on the dashboard. He was unusually silent and drove erratically. Wilkins thought "something bad was about to happen" and that Ferrell was "going to hurt me."

Finally, as they turned down Rushland Landing Road, Wilkins insisted that Ferrell get out of the car and leave her. He responded with silence and continued driving. When they reached the end of the road, he turned the car around, drank a beer, and proceeded to drive on. Wilkins testified that at that point, he said:

"I know you got that gun." And I didn't say anything.

Q. Okay. Then what happened?

A. He was going very slow. Very slow.

Q. And then what happened?

A. He said it again. "I know you've got that gun. Give me that gun."

Q. What did you say?

A. Nothing.

Q. Then what happened?

A. Billy speeded the car up and was staring at me, and he said, "I know you've got that [expletive] gun. Give me that [expletive] gun or I'm going to take it from you and I'm going to show you what to do with it, and this is where it ends for you," and he stopped the car suddenly.

Wilkins then reached for the pistol and shot Ferrell point blank in the head. She dumped his body at the scene, drove home, and told a friend she had shot Ferrell. Together they called the police.

At trial Wilkins called a psychiatrist who had been treating her after the shooting. Over the State's objection, the court qualified the psychiatrist as an expert for the purpose of giving an opinion relating to battered woman's syndrome. The psychiatrist testified that Wilkins manifested symptoms of abuse by Ferrell. When counsel asked him if he had an opinion about Wilkins's belief that she was in danger of death at the time of the shooting, the State objected. The following colloquy took place out of the jury's presence:

Q. Dr. Crane, do you have an opinion to a reasonable degree of medical certainty as to whether or not Alice Postell Wilkins . . . believed she was in danger of death or serious bodily harm at the time she fired the shot which killed Mr. Ferrell?

A. Yes, I do.

Q. . . . And what is that opinion?

A. That she did so believe.

The judge sustained the objection to this testimony on the ground that *State v. Hill*, 287 S.C. 398, 339 S.E. (2d) 121 (1986), permits an expert witness to testify as to the elements of battered woman's syndrome and whether the accused fits the elements of that syndrome, but does not allow an expert witness to testify as to the state of mind of the accused where that state of mind is the ultimate issue in the case.

The judge was clearly wrong in holding that an expert witness cannot express an opinion about the ultimate issue in the case. *See Rutledge v. St. Paul Fire and Marine Insurance Co.*, 286 S.C. 360, 334 S.E. (2d) 131 (Ct. App. 1985); Rule 24(c), South Carolina Rules of Criminal Procedure (testimony in the form of an opinion otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact). Questions going to an expert's knowledge of state of mind of the accused at the time of the crime are proper, and the expert's opinion as to state of mind is admissible. *See State v. Atkins*, — S.C. —, 399 S.E. (2d) 760 (1990), *cert. denied*, — U.S. —, 111 S. Ct. 2913, 115 L. Ed. (2d) 2913 (1991).

In *State v. Hill*, the Supreme Court held that evidence concerning battered woman's syndrome is a proper subject of expert testimony to establish a claim of self-defense in a homicide case. The Court rejected the trial judge's view that such testimony is cumulative to the defendant's own testimony about her state of mind. Rather, the Court noted, if the jury accepts the battered woman's version of what happened, expert testimony relating battered woman's syndrome to the defendant's state of mind will not only be relevant, but critical to establishing self defense. The Court characterized such testimony as "highly probative of the defendant's state of mind at the time of the incident." Nothing in the opinion suggests that an expert who states the defendant suffers from battered woman's syndrome cannot also give an opinion connecting that condition to her state of mind at the time of the homicide. Indeed, the Court strongly implies just the opposite. *See State v. Hudnall*, 293 S.C. 97, 359 S.E. (2d) 59 (1987).

Accordingly, we hold that the opinion testimony of Dr. Crane should have been admitted, and that its exclusion warrants reversal of the conviction and remand for a new trial. In

view of this holding, it is not necessary to rule on the other issues raised by Wilkins.

Reversed and remanded.

CURETON and GOOLSBY, JJ., concur.