WILLIAMS, J.:
**307 In this criminal appeal, Jeffrey Dana Andrews appeals his convictions of voluntary manslaughter and possession of a weapon during the commission of a violent crime. On appeal, Andrews argues the circuit court erred in (1) denying him immunity under the Protection of Persons and Property Act[1] **308 (the Act) due to inconsistent witness testimony, (2) refusing to qualify Investigator Terry Gainey as an expert in interrogation and force science when Gainey was qualified by experience and training, and (3) admitting the testimony of Emergency Medical Technician (EMT) paramedic Kimberly Graham when Graham was not an expert in crime scene investigation and her opinion was highly prejudicial. We affirm in part and reverse in part.
FACTS/PROCEDURAL HISTORY
On the evening of March 25, 2014, officers responded to a residential shooting in Sumter County, South Carolina. Corporal Jerry Kelly arrived first on the scene and found Shamar Howell (Victim) lying on Andrews's front porch with one bullet wound above his right eye. Erika Andrews, the mother of Victim's child and Andrews's cousin, sat screaming and crying on the porch holding Victim's head. She told Corporal Kelly that Andrews killed her boyfriend and was inside the residence. When Corporal Kelly entered the residence, Andrews willingly surrendered, stating "I'm the guy you're looking for." Corporal Kelly arrested Andrews and placed Andrews in his patrol car while he secured the scene.
Andrews was indicted for murder and possession of a weapon during the commission of a violent crime. Andrews filed a motion to dismiss the charges pursuant to the Act on the ground he acted in self-defense. Prior to trial, the circuit court conducted an immunity hearing on the matter. At the hearing, Andrews testified that at the time of the incident, he lived with his wife and his father, Robert Andrews, in one of Robert's trailers. On the night of the incident, Andrews was celebrating his re-enrollment in school, and he invited his cousin Virlyn Gardner over to *230 enjoy a bottle of brandy. Andrews, Gardner, and Robert left to eat dinner and hid the brandy bottle on the back porch next to the washer and dryer. Upon returning, Andrews noticed the dryer was in use[2] and the bottle of brandy was missing. Andrews discovered Erika's and Victim's clothes in the dryer. Andrews walked to Erika and Victim's nearby trailer and asked them if they had taken the bottle, which they denied, and Andrews left to get more **309 alcohol. Later that night, Andrews and Robert were socializing at their trailer with Gardner when Erika arrived, followed shortly by Victim. Erika and Victim left and returned to the trailer soon thereafter. Andrews testified that when Victim returned, he had one forty-ounce bottle of beer wrapped in a paper bag. Later that evening, Andrews again mentioned the missing brandy bottle, which Erika and Victim repeatedly denied taking.
Andrews testified that when he asked Erika and Victim to leave, verbal and physical altercations ensued; Victim advanced towards Andrews cursing and holding the forty-ounce beer bottle. Andrews testified he removed Victim to the front porch, while Erika was still inside, and he locked the screen door and closed the wooden front door. Andrews went to Robert's bedroom to retrieve the phone to call the police when he heard the wooden front door open and Erika and Victim talking. Unable to find the phone, Andrews began to exit Robert's room when he heard Victim insinuate Andrews was scared to come outside for fear of an altercation. Andrews, still at Robert's bedroom door, heard Victim "snatch" the locked screen door open and saw Victim crossing the threshold of the front doorway. Andrews grabbed a gun sitting on Robert's dresser, turned, and shot Victim as he came through the threshold of the doorway. Robert corroborated Andrews's testimony.
At this point in the hearing, the eyewitness testimony of Andrews and Robert varied substantially from Erika, the only other eyewitness to testify. Erika testified Victim chose to leave peacefully when Robert asked him to leave, and Victim never tried rushing back into the residence or pulling the screen door open after exiting. She testified Andrews went to Robert's bedroom as Victim peacefully said goodbye, and Andrews followed Victim closely behind as Victim exited the residence onto the front porch. Erika testified she was still inside the residence when she heard a gunshot, and she ran to the front door to see Andrews holding a gun. She also testified that, prior to the shooting, Victim never had a forty-ounce bottle of beer at the residence[3] and he never threatened or hit **310 Andrews.[4]
Andrews proffered Investigator Gainey as an expert in interrogation and force science[5] during the immunity hearing. No court had previously qualified Investigator Gainey as an expert in this field. However, Investigator Gainey had twenty years of law enforcement experience and previously attended one forty-hour, week-long force science course about officer-involved shootings and the timeline for interviewing officers after fatally shooting someone. Investigator Gainey testified the "golden rule" was to wait "[forty-eight] hours or two good sleep cycles" before interviewing an officer involved in a fatal shooting. He stated shootings typically caused "memory fragmentation[, a]nd after a couple of sleep cycles[,] you're able to consolidate your memories" and remember the event more clearly. Furthermore, Investigator Gainey testified that if a shooter was interviewed thirteen minutes after a shooting, he or she would have a "completely fragmented" memory and would need time to decompress to chronologically sort out the events. However, the circuit court declined to qualify Investigator *231 Gainey as an expert, noting his one-week course was insufficient qualification.
In response, the State called Corporal Kelly. After he arrested, Mirandized ,[6] and placed Andrews in his patrol car, Corporal Kelly asked Andrews why he shot Victim. Corporal Kelly testified Andrews's initial answer was that Victim took the brandy bottle but later stated he shot Victim because Victim refused to leave when he was asked. At trial and during the immunity hearing, Corporal Kelly stated Andrews did not mention a physical altercation until his second or third conversation with Corporal Kelly, and Andrews did not mention **311 fearing for his life until police interviewed him at the police station.[7]
At the end of the hearing, Andrews argued he was entitled to immunity under the Act because he was in imminent fear of bodily harm when Victim forcefully entered his residence. The circuit court rejected his argument, finding "very inconsistent" witness testimony created a jury question and finding Andrews failed to meet his burden of proof of a preponderance of the evidence. The case proceeded to trial.
At trial, both parties presented evidence similar to the evidence presented at the immunity hearing.[8] The State called Graham, the responding EMT paramedic. The circuit court qualified Graham as an expert in the field of Emergency Medical Services (EMS) without objection. Graham testified she received her Basic EMT certification in 1992; received her paramedic certification in 1998; and was certified in pediatric trauma life support, Hazmat, and cardiopulmonary resuscitation (CPR). Graham had responded to thousands of emergencies and was trained in taking vital signs, bandaging wounds, administering drugs and IVs, using a defibrillator, and intubating patients. Upon arriving on scene, Graham's job was to find the most critical patient and "begin life saving advances" on him or her. Graham testified that, when she arrived at Andrews's residence, Erika was screaming and lying on top of Victim on the front porch. She testified Victim was on his back with a gunshot wound above his right eye, his pupils were nonreactive, and the back of his head was "mushy," which she believed could have been attributed to the bullet or the back of his head hitting the concrete. The State further questioned Graham on direct examination:
[The State]: [C]ould [Victim] have talked?
[Graham]: No sir. When [Victim] was shot, the amount of force that it takes to go through and fracture the skull and then go through the brain, my opinion is whenever [Victim] was shot, he dropped ."
....
**312 [The State]: So based on your observation of the body, and your observation of the injury, where was [Victim] when he got shot?
[Graham]: He was standing on the porch.
[The State]: Outside?
[Andrews's Counsel]: Your Honor, I am going to object to that. Even as an expert, as an EMT, I don't think she's qualified with crime scene reconstruction work.
THE COURT: I think based upon her testimony that was not objected [to], that he dropped right there. I think she can say where he dropped. Overruled.
(emphasis added).
The State later called Dr. Janice Ross, who the court qualified as an expert in forensic pathology. Dr. Ross testified that Victim would have "collapsed" after he was shot due to his injuries, but she conceded "my findings don't exactly tell me the positions of the shooter and the victim." She acknowledged her findings were consistent with: (1) Victim entering the residence, seeing the gun, backing up, and turning, which led to Victim falling backwards onto the porch; or (2) Victim leaving the residence and looking back when he was shot.
After the State rested, Andrews called numerous witnesses and testified on his own *232 behalf. Andrews called John Davis, a private investigator, who testified that, based on measurements he had taken of Andrews's front porch and crime scene photos, he calculated the pool of blood from Victim's head wound was six feet, four inches from the door jam.[9] However, Davis testified he could not determine Andrews's and Victim's locations at the time of the shooting.
The jury found Andrews guilty of voluntary manslaughter and possession of a weapon during the commission of a violent crime. The circuit court denied Andrews's motion for a new trial and sentenced Andrews to thirty years' imprisonment. This appeal followed.
ISSUES ON APPEAL
I. Did the circuit court err in denying Andrews immunity under the Act?
**313 II. Did the circuit court err in refusing to qualify Investigator Gainey as an expert in interrogation and force science?
III. Did the circuit court err in allowing opinion testimony from Graham regarding Victim's location at the time of the shooting?
STANDARD OF REVIEW
"A claim of immunity under the Act requires a pretrial determination using a preponderance of the evidence standard, which [the appellate] court reviews under an abuse of discretion standard of review." State v. Curry , 406 S.C. 364, 370, 752 S.E.2d 263, 266 (2013). "An abuse of discretion occurs when the [circuit] court's ruling is based on an error of law or, when grounded in factual conclusions, is without evidentiary support." State v. Pittman , 373 S.C. 527, 570, 647 S.E.2d 144, 166-67 (2007). "[T]he abuse of discretion standard of review does not allow [the appellate] court to reweigh the evidence or second-guess the [circuit] court's assessment of witness credibility." State v. Douglas , 411 S.C. 307, 316, 768 S.E.2d 232, 238 (Ct. App. 2014). "A [circuit] court's decision to admit or exclude expert testimony will not be reversed absent a prejudicial abuse of discretion." State v. White , 382 S.C. 265, 269, 676 S.E.2d 684, 686 (2009).
LAW/ANALYSIS
I. Protections of Persons and Property Act
First, Andrews argues the circuit court abused its discretion by denying him immunity from prosecution under the Act. We disagree.
Subsection 16-11-450(A) of the South Carolina Code (2015) provides immunity from criminal prosecution to a person using deadly force as permitted by the Act. Further, section 16-11-440 of the South Carolina Code (2015) sets forth the circumstances under which the Act allows deadly force:
(A) A person is presumed to have a reasonable fear of imminent peril of death or great bodily injury to himself or another person when using deadly force that is intended or likely to cause death or great bodily injury to another person if the person:
**314 (1) against whom the deadly force is used is in the process of unlawfully and forcefully entering, or has unlawfully and forcibly entered a dwelling, residence, or occupied vehicle, or if he removes or is attempting to remove another person against his will from the dwelling, residence, or occupied vehicle; and
(2) who uses deadly force knows or has reason to believe that an unlawful and forcible entry or unlawful and forcible act is occurring or has occurred.
(B) The presumption provided in subsection (A) does not apply if the person:
(1) against whom the deadly force is used has the right to be in or is a lawful resident of the dwelling[ or] residence ....
....
(C) A person who is not engaged in an unlawful activity and who is attacked in another place where he has a right to be, including, but not limited to, his place of business, has no duty to retreat and has the right to stand his *233 ground and meet force with force, including deadly force, if he reasonably believes it is necessary to prevent death or great bodily injury to himself or another person or to prevent the commission of a violent crime as defined in Section 16-1-60.
To claim immunity under the Act, an accused must demonstrate the elements of self-defense, save the duty to retreat, to the satisfaction of the circuit court by the preponderance of the evidence. Curry , 406 S.C. at 370-71, 752 S.E.2d at 266.
Specifically, Andrews argues that like in State v. Duncan ,[10] after Andrews ordered Victim to leave his home, Victim attempted to reenter forcefully and without permission, which put Andrews in fear of great bodily harm, and caused him to lawfully shoot Victim in his residence. He further argues, the circuit court, "as the trier of fact at the immunity hearing, had the duty to make credibility findings whe[n] [the court] found the evidence was not consistent." Andrews maintains the court committed reversible error by finding the inconsistent testimony **315 made Andrews's self-defense claim a "quintessential jury question."
In Duncan , the victim was a guest in the accused's residence when the accused asked him to leave. 392 S.C. at 407, 709 S.E.2d at 663. The victim left but returned a few minutes later. Id . The victim was opening the screen door when the accused exited the front door onto his porch with a gun. Id . The accused shot the victim as the victim continued to force his way onto the accused's porch. Id . Our supreme court found the accused was entitled to immunity under the Act because eyewitness testimony and statements were consistent and "showed by a preponderance of the evidence that the victim was in the process of unlawfully and forcefully entering [the accused's] home" when he was shot. Id . at 411, 709 S.E.2d at 665.
In Curry , our supreme court affirmed the circuit court's denial of immunity under the Act. 406 S.C. at 372, 752 S.E.2d at 267. The court noted the accused's testimony varied "substantially" from the State's eyewitness testimony as to whether the victim had attacked the accused. Id. at 369, 752 S.E.2d at 265. Thus, the accused's "claim of self-defense present[ed] a quintessential jury question, which, most assuredly, [was] not a situation *234 warranting immunity from prosecution" under the Act. Id. at 372, 752 S.E.2d at 267.
Similarly, in State v. Butler , our supreme court affirmed the circuit court's denial of a motion for a directed verdict on self-defense, determining the evidence created a jury issue on the question of self-defense. 407 S.C. 376, 382, 755 S.E.2d 457, 460-61 (2014). The court noted the accused made various inconsistent statements about how the victim's stabbing occurred and also noted the accused's injuries were inconsistent with her testimony regarding how, and with what objects, the victim attacked the accused. Id. at 382, 755 S.E.2d at 460.
Unlike Duncan , in the instant case, witness accounts varied over whether Victim was in the process of unlawfully and forcefully entering Andrews's residence. Andrews's and Robert's testimonies-regarding whether Victim hit and threatened Andrews prior to the incident and whether Victim was peacefully leaving or forcefully entering the residence when Andrews shot him-varied substantially from Erika's **316 eyewitness testimony.[11] The accused is not entitled to immunity under the Act, when the accused's testimony is in direct conflict with eyewitness testimony as to whether the victim attacked the accused. Curry , 406 S.C. at 372, 752 S.E.2d at 267. "When the evidence is susceptible of more than one reasonable inference, questions of fact must be submitted to the jury." Butler , 407 S.C. at 382, 755 S.E.2d at 460 (quoting State v. Richburg , 250 S.C. 451, 459, 158 S.E.2d 769, 772 (1968) ); see also Curry , 406 S.C. at 372, 752 S.E.2d at 267 (finding the accused's "claim of self-defense present[ed] a quintessential jury question, which, most assuredly, [was] not a situation warranting immunity from prosecution" when the defendant was in a prior altercation with the victim and later retrieved a gun and shot the victim). The conflicting eyewitness testimony created a self-defense issue for the jury; therefore, the circuit court properly submitted the case to the jury. We affirm this issue.
II. Expert Disqualification
Second, Andrews argues the circuit court abused its discretion during the immunity hearing by refusing to qualify Investigator Gainey as an expert in interrogation and force science. We disagree.
"If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." Rule 702, SCRE. However, "[b]efore a witness is qualified as an expert, the [circuit] court must find (1) the expert's testimony will assist the trier of fact, (2) the expert possesses the requisite knowledge, skill, experience, training, or education, and (3) and the expert's testimony is reliable." State v. Martin , 391 S.C. 508, 513, 706 S.E.2d 40, 42 (Ct. App. 2011). Moreover, "[a] [circuit] court's decision to admit or exclude expert testimony will not be reversed absent a prejudicial abuse of discretion." White , 382 S.C. at 269, 676 S.E.2d at 686.
**317 "The familiar evidentiary mantra that a challenge to evidence goes to 'weight, not admissibility' may be invoked only after the [circuit] court has vetted the matters of qualifications and reliability and admitted the evidence." Id. at 274, 676 S.E.2d at 689.
"To be competent to testify as an expert, 'a witness must have acquired by reason of study or experience[,] or both[,] such knowledge and skill in a profession or science that he is better qualified than the jury to form an opinion on the particular subject of his testimony.' " Nelson v. Taylor , 347 S.C. 210, 214, 553 S.E.2d 488, 489 (Ct. App. 2001) (quoting Gooding v. St. Francis Xavier Hosp. , 326 S.C. 248, 252-53, 487 S.E.2d 596, 598 (1997) ). "Qualification depends on the particular witness' reference to the subject." Id. at 214, 553 S.E.2d at 490. "The party offering the expert has the burden of showing his witness possesses the necessary learning, skill, or practical experience to enable the witness to give opinion testimony." State v. Von Dohlen , 322 S.C. 234, 248, 471 S.E.2d 689, 697 (1996). Despite Investigator Gainey's twenty years' experience in law enforcement, Andrews failed to demonstrate how Investigator Gainey was qualified to give expert testimony on fragmented post-shooting interrogation memory of a non-officer shooter. Investigator Gainey's one-week course on force issues in law enforcement did not address interviewing non-officer shooters and only dedicated one day to cognitive interviewing. We affirm the circuit court.
III. EMT Paramedic Testimony
Last, Andrews argues the circuit court erred in allowing opinion testimony from EMT paramedic Graham regarding Victim's location at the time of the shooting. We agree.
A. Qualification
Specifically, Andrews maintains Graham was not qualified as an expert in "crime scene reconstruction," and as a result, she was not qualified to offer opinion testimony on Victim's location at the time of the shooting.
"Testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact."
**318 Rule 704, SCRE. However, an opinion may be offered on the ultimate issue of the case only when the witness is otherwise qualified. State v. Wilkins , 305 S.C. 272, 277, 407 S.E.2d 670, 672-73 (Ct. App. 1991). Likewise, an expert's testimony may not exceed the scope of his expertise. State v. Ellis , 345 S.C. 175, 177-78, 547 S.E.2d 490, 491 (2001).
In the instant case, the court qualified Graham as an expert in the field of EMS without objection. As such, Graham was qualified to testify, as she did, to prehospital emergency care administered to Victim and *235 to the resulting medical observations of his body and injuries. See Gooding , 326 S.C. at 253, 487 S.E.2d at 598 ("Qualification depends on the particular witness' reference to the subject."); S.C. Code Ann. Regs. 61-7 § 200(N)(1), (4) (Supp. 2017) (defining "paramedic" as a person "intended to provide leadership and to deliver prehospital emergency care and provide rapid on-scene treatment" and defining "EMT basic" as a person "specially trained and certified to administer basic emergency services to victims of trauma or acute illness before and during transportation to a hospital or other healthcare facility").
However, we find the circuit court abused its discretion in allowing opinion testimony from EMT paramedic Graham regarding Victim's location at the time of the shooting. Despite Graham's previous, un-objected to testimony-"whenever he was shot, he dropped"-we find Graham's subsequently challenged testimony-that Victim "was standing on the porch" when he was shot-exceeded the scope of her expertise in emergency medical services and was, therefore, inadmissible. In effect, by admitting into evidence Graham's challenged testimony that Victim was on the porch when he was shot, the circuit court allowed Graham to give her opinion on the ultimate issue: whether Andrews acted in self-defense when he shot and killed Victim. See Wilkins , 305 S.C. at 276, 407 S.E.2d at 672-73 (stating an opinion may be offered on the ultimate issue only when the witness is otherwise qualified ); see also Ellis , at 178, 547 S.E.2d at 491 (stating that by admitting the officer's testimony regarding the location of the body at the time of the shooting, the circuit court, in effect, allowed the officer to give an unqualified opinion on the ultimate issue of whether the defendant had been acting in self-defense when he shot and killed the victim). We find the **319 circuit court erred in admitting Graham's testimony regarding Victim's location at the time of the shooting.
B. Harmless Error
The State contends Graham's testimony was harmless. We disagree.
Graham's testimony improperly undermined Andrews's self-defense claim as it was beyond the scope of her expertise and went to the heart of Andrews's defense. See Ellis , at 178, 547 S.E.2d at 491 ("While the State was free to argue that the evidence supported an inference that the victim was astride the bicycle when shot, and while the jury could certainly have concluded that he was, [the officer] was not qualified to give such an 'expert' opinion. An officer's improper opinion which goes to the heart of the case is not harmless."); State v. Huckabee , 419 S.C. 414, 430, 798 S.E.2d 584, 592-93 (Ct. App. 2017) (finding improper testimony was not harmless, in part, because it went to the heart of the appellant's defense), cert. denied , S.C. Sup. Ct. Order dated May 24, 2018. Further, Victim's location was not a well-established fact because eyewitness and expert testimony was either inconclusive or conflicting regarding Victim's location at the time of the shooting. See State v. Doctor , 306 S.C. 527, 530, 413 S.E.2d 36, 38 (1992) ("When a witness' testimony is disputed or his credibility called into question, other testimony verifying the facts or opinions given by the witness is not merely cumulative."); but see Douglas , 411 S.C. at 326, 768 S.E.2d at 243 (finding improperly-admitted testimony harmless when the subject of the challenged testimony is well-established by properly admitted evidence prior to the admission of the improper testimony).
Graham's challenged testimony was not merely cumulative to Dr. Ross's testimony. Although Dr. Ross's testimony-that Victim would have "collapsed" after being shot-is comparable to Graham's testimony-that "whenever he was shot, he dropped"-Dr. Ross did not testify as to Victim's location at the time of the shooting. Rather, Dr. Ross conceded her findings were inconclusive as to the positions of Andrews and Victim at the time of the shooting, and that Victim could have been entering or exiting Andrews's residence when he was **320 shot. Thus, Graham's testimony that Victim "was on the porch" was not merely cumulative to Dr. Ross's testimony that Victim collapsed.
We reverse and remand for a new trial on this issue. See *236 Ellis , 345 S.C. at 180, 547 S.E.2d at 492 (reversing and remanding appellant's sentence and conviction because "an unqualified witness was permitted to offer an expert opinion on the ultimate issue").
CONCLUSION
Based on the foregoing analysis, the circuit court is
AFFIRMED IN PART and REVERSED IN PART.
LOCKEMY, C.J., and KONDUROS, JJ., concur.

See S.C. Code Ann. §§ 16-11-410 through -450 (2015).

Three people had permission to use the washer and dryer: Jenny Bell, Erika, and Victim.

State's exhibit No. 7 was admitted at trial showing a forty-ounce beer bottle wrapped in a brown paper bag next to the front porch after the incident.

Erika explained Victim would never hit Andrews as that behavior was out of character for him. However, Andrews attacked Erika's credibility with a police report, stating Erika and Victim assaulted Teresa Williams a few weeks before Victim's death. Erika maintained Victim was not involved with the Williams incident.

Investigator Gainey described force science as the use of force issues within law enforcement.

Miranda v. Arizona , 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

At the station Andrews indicated, "I need to talk about this in the morning. I'm all twisted."

Andrews did not call Investigator Gainey to testify at trial.

Dr. Ross previously testified Victim was six feet tall.

392 S.C. 404, 709 S.E.2d 662 (2011).

The circuit court found "[t]he testimony [was] conflicting as to what the different witnesses saw and what happened on the night in question," which created a question for the jury.