**THIS OPINION HAS NO PRECEDENTIAL VALUE. IT SHOULD NOT BE CITED OR RELIED ON AS PRECEDENT IN ANY PROCEEDING EXCEPT AS PROVIDED BY RULE 268(d)(2), SCACR.**

**THE STATE OF SOUTH CAROLINA**
In The Court of Appeals

The State, Respondent,

v.

John Michael Hughes, Appellant.

Appellate Case No. 2017-002539

―――――――――――

Appeal From Greenville County
Perry H. Gravely, Circuit Court Judge

―――――――――――

Unpublished Opinion No. 2021-UP-024
Heard September 10, 2020 – Filed January 27, 2021

―――――――――――

**AFFIRMED**

―――――――――――

Andrew Sims Radeker, of Harrison, Radeker & Smith
P.A., and Chief Appellate Defender Robert Michael
Dudek, both of Columbia, for Appellant.

Attorney General Alan McCrory Wilson, Deputy
Attorney General Donald J. Zelenka, Senior Assistant
Deputy Attorney General Melody Jane Brown, and
Assistant Attorney General Caroline M. Scrantom, all of
Columbia, for Respondent.

―――――――――――

**PER CURIAM:**   John Michael Hughes appeals his convictions for murder, possessing a weapon while committing a violent crime, and conspiracy; all in connection with the shooting death of his estranged son-in-law, John Ferrell.  He raises six issues on appeal.  We respectfully disagree with each of his arguments for reversal.  Thus, we affirm.

## FACTS

Victim was in a contentious custody dispute with his wife Jane.  Jane and her children were living with her parents.  Jane's adult brother also lived there, as did Jane's boyfriend.

Victim was invited to Jane's parents' house on the evening in question.  Apart from that fact, Appellant and the State tell widely divergent stories.

Appellant testified Jane's boyfriend was asked to wait in a shed behind the house while Victim came over to discuss a family court hearing scheduled to occur a few days later.  Appellant said Victim argued with others in the family before leaving and after Victim left, Appellant locked the house and everyone settled in their rooms for the evening.  Appellant claimed he heard suspicious noises and grabbed his pistol before hollering for someone to call 9-1-1 and proceeding out the front door.  Then, Appellant said he turned the corner of the house, saw an unidentified figure (he denied knowing it was Victim) hanging half in and half out of the kitchen window, and shouted for the man to get down.  Appellant shot Victim multiple times.  He said this was after Victim jumped down from the window and made two charges at him; the second charge supposedly coming after the first round of shots.

Other physical and testimonial evidence tended to show Appellant's version of events was near impossible.  For one, Victim was "very large"—5'7" and 286 pounds.  The forensic pathologist explained "[a]n obese man with this degree of heart disease, an enlarged heart, emphysema[,] and an enlarged liver with fat could not be described as healthy."  The State argued these physical limitations prevented Victim from trying to climb in a window nearly six feet off the ground, jumping down, accelerating in a threatening manner, and then resuming his charge after being shot.

The State also argued the nature of Victim's gunshot wounds undermined Appellant's narrative.  The gunshot wounds were all at a downward angle, suggesting Victim was likely on the ground looking up at the shooter as he was killed.  On top of these things, police found Victim lying on the ground with his pants and underwear down around his ankles, and though Victim had a bullet wound in his leg, there were no

corresponding bullet holes in Victim's pants, suggesting Victim's pants were pulled down when he was shot.

The State claimed this corroborated its theory of the case, which was that Appellant and others in his family coordinated to get Victim over to the house, kill him, and make it look like Victim tried to break into the home. Jane's live-in boyfriend testified that he eventually left the backyard shed to see what was going on inside the house and that when he got to the house he saw Victim crouched on the floor and trying to cover his face as Jane pummeled Victim's head with a hammer. Victim had injuries consistent with this sort of assault. Boyfriend also reported seeing Jane's brother pointing a taser at Victim and Appellant aiming a gun at Victim.

Jane's boyfriend said he convinced Jane to drop the hammer and call 9-1-1. Victim then supposedly jumped out a small kitchen window headfirst, knocking the window A/C unit outside. Appellant's wife and son allegedly grabbed at Victim as he forced his way out the window. The State believed this explained Victim's pants and underwear being around his ankles. Boyfriend said Appellant then ran outside and shot Victim.

**ISSUES**

1. Whether the circuit court properly allowed testimony and exhibits concerning a field test officers used to presumptively identify blood.

2. Whether the pre-trial immunity hearing held pursuant to the South Carolina Protection of Persons and Property Act[1] (Stand Your Ground Act) was defective.

3. Whether the circuit court properly admitted data from Appellant's cell phone.

4. Whether the court properly admitted a 9-1-1 call recording under the excited utterance exception to hearsay.

5. Whether the court should have directed a verdict on the conspiracy charge.

---

[1] S.C. Code Ann. § 16-11-410 *et seq* (Supp. 2019).

6. Whether the court should have charged the jury that Appellant was statutorily presumed to have a reasonable fear of death or great bodily injury.

## LAW/ANALYSIS

**Issue 1:  Leuco Crystal Violet (LCV) Testing – Field Testing For Blood**

A police officer testified at trial that he used LCV testing to identify presumptive blood in various spots throughout Appellant's home.  Photos of these test results were also introduced.  Appellant argues LCV testing is unreliable because it can produce false positives and the officer was not properly qualified as an expert.

Rule 702, SCRE "applies its reliability standard to all 'scientific,' 'technical,' or 'other specialized' matters within its scope." *State v. White*, 382 S.C. 265, 270, 676 S.E.2d 684, 686 (quoting *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999)). When examining scientific, technical, or other specialized matters under Rule 702, trial courts should examine "1) the publications and peer review of the technique; 2) prior application of the method to the type of evidence involved in this case; 3) the quality control procedures used to ensure reliability; and 4) the consistency of the method with recognized scientific laws and procedures" before ruling on the admissibility of scientific or other technical matters.  *State v. Council*, 335 S.C. 1, 19, 515 S.E.2d 508, 517 (1999).

The standard of review is deferential.  Evidentiary rulings rest in "the trial court's sound discretion" and we disturb them only "upon a showing of a 'manifest abuse of discretion accompanied by probable prejudice.'"  *State v. Commander*, 396 S.C. 254, 262–63, 721 S.E.2d 413, 417 (2011) (quoting *State v. Douglas*, 369 S.C. 424, 429, 632 S.E.2d 845, 847–48 (2006)).

Here, the officer explained LCV is "a reagent and a presumptive test.  It reacts to hemoglobin in blood.  When you get a positive result, it will turn a violet color when sprayed and it makes contact with suspected blood."  Regarding reliability, the officer testified LCV spray is used by law enforcement agencies throughout the country, including the FBI.

The trial court qualified the officer as an expert in the "use" of LCV, but not its chemical makeup.  The court compared the officer's level of expertise on LCV testing with that of an officer who operates a DataMaster machine (sometimes called a "breathalyzer"), explaining the DataMaster operator is "trained to use it and how

it's used and the results, but that doesn't mean they know all the little intricacies and how the chemical is made."

We need not determine whether admitting the officer's testimony was error, because any error in admitting this testimony would plainly be harmless. *See State v. Bonilla*, 429 S.C. 253, 285, 838 S.E.2d 1, 17–18 (Ct. App. 2019) ("[A]ny error in failing to determine [the expert's] qualifications and the reliability of his testimony would be harmless when considering the overwhelming evidence of [the appellant]'s guilt."). The same officer testified, without objection, that he saw what he suspected to be blood in and around Appellant's home. Approximately twenty-five samples were taken in for DNA analysis. We will refrain from going over the results of each test; it suffices to say the scientific evidence showed Victim's blood throughout the kitchen and in other areas of the home. This was entirely inconsistent with Appellant's version of events that there was no physical altercation inside the home and completely cumulative to the testimony regarding the LCV test results.

## Issue 2: Immunity Hearing

Appellant claims the pre-trial immunity hearing was flawed because the officer was allowed to testify about LCV testing. We reject that argument for the reasons given above. Appellant also argues the trial court "assumed" there was evidence showing his story was not possible and seemed to think the Stand Your Ground Act didn't apply within a home's curtilage.

"A defendant's entitlement to immunity from prosecution . . . must be decided pretrial using a preponderance of the evidence standard." *State v. Glenn*, 429 S.C. 108, 116, 838 S.E.2d 491, 495 (2019). This court applies the abuse of discretion standard to a trial court's immunity determination. *See State v. Andrews*, 424 S.C. 304, 313, 818 S.E.2d 227, 232 (Ct. App. 2018). Appellant and the State agree the Stand Your Ground Act does not contain any specific guidelines or procedures for the pre-trial hearing.

The trial court explained Appellant bore the burden of proof by a preponderance of the evidence and, in our estimation, conducted a full and fair hearing. Appellant takes issue with the fact that toward the end of the hearing the trial court asked, "[h]ow do you address all this physical evidence that just absolutely shows that [Appellant's] story could not be possible?" We find no issue with the court's question and see no basis for finding an abuse of discretion in denying immunity.

We respectfully disagree with Appellant's assertion the court was "operating under the assumption that the Act does not apply when a person is in the curtilage of his

own home." We do not read this to be the basis of the trial court's ruling. Instead, the court dismissed Appellant's argument explaining "even in a preponderance of evidence, I don't think you've raised the level that immunity applies."

**Issue 3: Cell Phone Data**

Police obtained text messages between Appellant and his son via a search warrant for Appellant's phone. But the affidavit supporting the warrant had a plain error: rather than referencing the likelihood of finding information on *Appellant's* phone, the affidavit indicates the police wished to search *Victim's* phone. Here and below, Appellant asserts the warrant was deficient. The trial court admitted the text messages citing the inevitable discovery doctrine and the State's representation that police obtained precisely the same text messages through a proper search of son's phone via production from son's service provider.

The trial court's reasoning applies the "independent source" doctrine, not inevitable discovery. Independent source allows tainted evidence's admission if the same evidence was discovered via another avenue that is separate from any constitutional violation. *See State v. Moore*, 429 S.C. 465, 478-79, 839 S.E.2d 882, 889 (2020); *see also Nix v. Williams*, 467 U.S. 431, 443–44 (1984). As already noted, the solicitor explained an investigator sent a separate search warrant for Appellant's son's phone and obtained the very same text exchanges between Appellant and Appellant's son.

Appellant argues the trial court erred in taking the solicitor at his word that the State obtained the same messages through other means. In his view, the State needed to call the police officer who requested Appellant's son's phone records and a representative from the cell phone service provider as witnesses to prove the State did, in fact, acquire the same information from the son's phone. The only authority Appellant offers in support of this argument is the principle that "[a]rguments of council are not evidence."

As we read the record, defense counsel did not dispute the State obtained the same messages through a search of the son's phone. Instead, defense counsel contended the State would need to subpoena different witnesses to testify in front of the jury. The trial court directly asked the solicitor whether, as an officer of the court, the State had obtained the same messages from a search of the son's phone. The solicitor responded affirmatively. We could not locate any authority requiring the trial court to do more than this, though the court no doubt had the discretion to hear witness testimony if it desired. We find no abuse of discretion.

**Issue 4: 9-1-1 Recording**

The State offered the recording of Jane's 9-1-1 call into evidence. The trial court admitted it as an excited utterance.

Appellant argues the excited utterance hearsay exception cannot apply because the State's own theory, which was that Jane essentially shifted back and forth during the call between false statements to the operator and truthful statements to people in the background of the call, undermines the exception's reasoning. Jane told the 9-1-1 operator Victim was trying to kill her—a fact the State adamantly believed was false—but the recording also captured muffled statements Jane made to people near her; statements the State alleged were truthful and incriminating.

"The rules of evidence define excited utterance as a 'statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition.'" *State v. Ladner*, 373 S.C. 103, 116, 664 S.E.2d 684, 691 (2007) (quoting Rule 803(2), SCRE).

> Three elements must be met in order for a statement to be an excited utterance: (1) the statement must relate to a startling event or condition; (2) the statement must have been made while the declarant was under the stress of excitement; and (3) the stress of excitement must be caused by the startling event or condition.

*State v. Washington*, 379 S.C. 120, 124, 665 S.E.2d 602, 604 (2008).

The recording did not strike the trial court as powerful evidence. Upon hearing it, the judge remarked "I'm not really sure what she said" and "I couldn't even tell what the testimony was, quite frankly . . . ." The incriminating statements also appeared cumulative to the mountain of evidence already before the court including Boyfriend's testimony, the blood and DNA evidence, and the fact that Victim's other wounds were consistent with his being assaulted with a hammer.

We have listened to the call and we agree with the State that Jane certainly sounds frantic as she is speaking with the 9-1-1 operator. We also agree with the trial court that the allegedly incriminating statements in the background are extremely difficult to hear. A lay person would probably say the words "startling and stressful" understate the situation, regardless of whose theory of the case is believed. We see no abuse of discretion, and we are also convinced that if admitting this tape was error, it was harmless.

**Issue 5: Directed Verdict on Conspiracy**

> [W]hen ruling on a directed verdict motion, the trial court views the evidence in the light most favorable to the State and must submit the case to the jury if there is "any substantial evidence which reasonably tends to prove the guilt of the accused, or from which his guilt may be fairly and logically deduced."

*State v. Bennett*, 415 S.C. 232, 236–37, 781 S.E.2d 352, 354 (2016) (quoting *State v. Littlejohn*, 228 S.C. 324, 329, 89 S.E.2d 924, 926 (1955)). "[T]he trial court is concerned with the existence of evidence, not its weight." *State v. Phillips*, 416 S.C. 184, 192, 785 S.E.2d 448, 452 (2016). "A conspiracy is a combination or agreement between two or more persons for the purpose of accomplishing a criminal or unlawful object, or of achieving by criminal or unlawful means an object that is neither criminal nor unlawful." *State v. Simms*, 377 S.C. 598, 606, 661 S.E.2d 122, 126 (Ct. App. 2008) (quoting *State v. Gunn*, 313 S.C. 124, 133–34, 437 S.E.2d 75, 80 (1993)). An overt act is not required. *See id*.

Appellant argues the trial court should have granted directed verdict on conspiracy because there was no proper evidence of a conspiracy to murder Victim. We agree with the trial court's finding that there was some evidence of "a joint effort . . . to do away with [Victim] in light of the custody issue" and that there was enough evidence to send the matter to the jury. The evidence includes Boyfriend's detailed description of the multi-person assault that was corroborated by the physical evidence and incriminating text messages between Appellant and his son on the evening of the attack. Appellant and his son discussed arranging late-night "pie" and "dessert." Overall, it was a jury question whether these were consistent with Appellant's story that Victim was invited over to discuss a family court case, left Appellant's home after a disagreement, then later returned in an attempt to sneak in through the kitchen window.

**Issue 6: Jury Charge**

Appellant argues the Stand Your Ground Act entitled him to a jury charge on the presumption of reasonable fear of death or great bodily injury on account of evidence Victim was in the process of unlawfully and forcefully entering Appellant's residence. The State argues this presumption applies only for the purpose of pre-trial immunity.

*State v. Curry* controls this argument. *Curry* held a trial court erred in instructing the jury on the Stand Your Ground Act when the court had previously ruled defendant was not entitled to immunity under the Act. 406 S.C. 364, 373, 752 S.E.2d 263, 267 (2013). Though *Curry* dealt with a different part of the statute—the defendant relied on subsection (C) and Appellant argues he was entitled to a jury charge on subsection (D)—we read *Curry* as recognizing that once immunity from prosecution has been denied, the appropriate jury charges are self-defense and any other common law defenses.

**CONCLUSION**

Based on the foregoing, the circuit court's judgment is

**AFFIRMED.**

**THOMAS, HILL, and HEWITT, JJ., concur.**